**Robert O. MARSHALL, Petitioner,**

v.

**Roy HENDRICKS, Superintendent, New Jersey State Prison, and John J. Farmer, Attorney General of New Jersey, Respondents.**

**Civil Action No. 97–5618(JEI).**

United States District Court, D. New Jersey.

June 23, 2000.

that only the terminology has changed. (*See* Pl.'s Br. at 14 –15)

Joan D. Van Pelt, Deputy Public Defender, Office of Public Defender, Appellate Section, Newark, NJ, for Petitioner.

John J. Farmer, Attorney General of New Jersey by Robert E. Bonpietro, Deputy Attorney General, Div. of Criminal Justice, Appellate Bureau, Trenton, NJ, for Respondents.

## OPINION

IRENAS, District Judge.

Robert O. Marshall ("petitioner"), a New Jersey prisoner currently under a sentence of death, brings a twenty-two count petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner also moves for discovery under Rule 6 of the Federal Rules Governing Section 2254 Cases and for an evidentiary hearing. For the reasons set forth below, petitioner's motion for discovery is denied, his motion for an evidentiary hearing is denied, and all counts of his petition are denied.

### I. Procedural Background

On March 5, 1986, in the Superior Court of New Jersey, Law Division, Atlantic County, following a jury trial, petitioner was convicted of murder and conspiring to murder his wife Maria Marshall and was sentenced to death by lethal injection. The New Jersey Supreme Court upheld petitioner's conviction and death sentence on January 24, 1991, 123 N.J. 1, 586 A.2d 85 (1991) and on July 28, 1992, concluded that his death sentence was not disproportionate to other sentences imposed in similar cases. 130 N.J. 109, 613 A.2d 1059 (1992). Petitioner was denied reconsideration of his proportionality review on September 11, 1992, and was denied certiorari by the United States Supreme Court on February 22, 1993. 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993).

While the proportionality phase was pending, on October 22, 1993, petitioner obtained a stay of execution from the Law Division and filed an amended application for post-conviction relief ("PCR") and requested an evidentiary hearing. In his application, relying on the First, Fourth, Fifth, Sixth, Eighth and Fourteenth

Amendments to the United States Constitution, petitioner claimed, among other things, that he was a victim of: discovery and *Brady* violations; instances of ineffective assistance of counsel; prosecutorial misconduct; a warrantless seizure of evidence; and the absence of an impartial jury. Petitioner did not receive an evidentiary hearing on the majority of his claims and PCR was denied on procedural grounds. On appeal, the New Jersey Supreme Court reversed the dismissal of petitioner's claims on procedural grounds, and after reaching the merits of his claims, affirmed the denial of PCR. 148 N.J. 89, 690 A.2d 1 (1997). Petitioner was denied reconsideration on his PCR issues on March 24, 1997, and was denied certiorari by the United States Supreme Court on October 6, 1997. 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997).

On October 30, 1997, Marshall filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his conviction and sentence on twenty-two grounds, which are divided into four types of claims. Petitioner contends that: (1) the State deprived him of his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by withholding exculpatory evidence from the defense in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) the State engaged in a willful and persistent course of misconduct which violated petitioner's due process rights; (3) the State improperly seized and admitted into evidence a tape recording made by petitioner which violated the attorney-client privilege, federal mail statutes, and his Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; and (4) the State deprived him of various other constitutional rights including (a) effective assistance of counsel; (b) a fair and impartial jury and a reliable determination of guilt and sentencing; (c) confrontation; (d) correct jury instructions; (e) a fair and reliable penalty trial; and (f) a fair trial and post-conviction review. In this last group of claims, Marshall also asserts that (i) the New Jersey rule prohibiting post-trial contact with jurors is unconstitutional and (ii) the New Jersey Capital Punishment Statute and its procedure for reviewing capital convictions and death sentences is unconstitutional.

## II. Facts

The facts in this case are extensively set forth in the New Jersey Supreme Court's findings in petitioner's direct appeal, *State v. Marshall,* 123 N.J. 1, 586 A.2d 85 (1991) (*"Marshall I"*) and its opinion affirming the denial of post conviction relief, *State v. Marshall,* 148 N.J. 89, 690 A.2d 1 (1997) (*"Marshall III"*). The Court has also independently reviewed the record of the state court proceedings.

On September 6, 1984, petitioner, an insurance agent from Toms River, New Jersey took his wife of 20 years, Maria Marshall, to Harrah's Casino in Atlantic City. At approximately 12:30 a.m. the following morning, on their way home, petitioner, alleging a problem with the tire, pulled into the Oyster Creek picnic area off the Garden State Parkway. While his wife lay sleeping on the car's front seat, petitioner claims he got out of the car, was hit over the head, and lost consciousness. His wife was shot twice in the back and died immediately. When the police arrived at the scene, petitioner suggested that a thief murdered his wife. Following brief questioning by the police, petitioner was sent to the hospital where he received stitches for his head wound.

Following Mrs. Marshall's murder, petitioner admitted that he was involved in an extramarital affair with Sarann Kraushaar, a married woman, since June, 1983. The police learned that in May, 1984, petitioner met Robert Cumber of Louisiana at a party and discussed hiring an out of town "investigator" to investigate his wife. Mr. Cumber referred petitioner to Billy Wayne McKinnon, a former sheriff's officer also from Louisiana.

According to testimony given by Mr. McKinnon, in a meeting on June 18, 1984, in Atlantic City, petitioner offered to pay him $65,000 to kill Maria Marshall, which included $50,000 from her expected life insurance proceeds. McKinnon testified that petitioner wanted the job done on the date of that first meeting; he discussed various ways to kill his wife and gave McKinnon $7,000 and a picture of his wife. McKinnon did not commit the murder on that night but, instead, traveled back to Louisiana. McKinnon testified that petitioner was persistent in his efforts, and continued to pay him and encouraged him to return to New Jersey to complete the job. McKinnon returned on July 19, 1984 and met with petitioner to discuss plans to kill Mrs. Marshall on that night in the parking lot of a restaurant. However, for the second time, McKinnon did not go through with the murder.

Although McKinnon testified that he did not murder Mrs. Marshall on either of the scheduled dates, he said petitioner still offered him an additional $15,000 if he would return to New Jersey to commit the murder before Labor Day. McKinnon agreed and arrived back in New Jersey on September 6, 1984. He and petitioner met for the third time that day and together selected a place off the Garden State Parkway to carry out the murder. According to McKinnon, their plan was to make the murder look like a robbery.

At 9:30 p.m. on the same night, petitioner met with McKinnon for the last time at Harrah's Casino, where he took his wife for a night of dinner and gambling. According to McKinnon, petitioner told him that he and his wife would be leaving the Casino at midnight. Later that night Maria Marshall was murdered.

Shortly after Maria Marshall's murder, telephone records connected petitioner to McKinnon. In exchange for a plea to conspiracy to commit murder, McKinnon implicated petitioner and named Larry Thompson, also from Louisiana, as the shooter. The police's investigation revealed that during the time petitioner was planning his wife's murder, he increased the amount of coverage of her life-insurance policies. At the time of her murder, Maria Marshall was insured for approximately $1.4 million. The police also discovered that petitioner had rising debts including a $128,000 home-equity loan and a bank debt exceeding $40,000. Additionally, at the time of his wife's murder, petitioner continued to carry-on an extramarital relationship with Mrs. Kraushaar, with whom he planned to live with after the murder.

Larry Thompson, petitioner's co-defendant at trial, was acquitted by the jury.[1] However, the jury found petitioner guilty of murder and conspiracy to commit murder. Pursuant to New Jersey law, N.J.S.A. 2C:11–3C, in the penalty phase of petitioner's trial, the same jury found one aggravating factor: that petitioner hired another to commit murder. It also found two mitigating factors: that defendant had no history of criminal activity and the catch-all mitigating factor, that petitioner was involved in charitable and community activities. The jury found that the aggravating factor outweighed the mitigating factors and sentenced petitioner to death.

### III. Motion for Discovery

■ Petitioner seeks discovery of certain materials he claims are necessary to this Court's decision on his habeas corpus petition. A habeas petitioner, unlike the usual civil litigant in federal court, is not

---

1. Robert Cumber was charged with conspiracy to murder Maria Marshall and as an accomplice in causing her death. He was tried separately from defendants Marshall and Thompson, convicted on both counts, and sentenced to 30 years in prison without eligibility for parole. All of Cumber's appeals were unsuccessful as was a later petition for habeas corpus. *State v. Cumber,* 103 N.J. 506, 511 A.2d 675 (1986); *State v. Cumber,* 127 N.J. 327, 604 A.2d 601, *cert. denied,* 499 U.S. 980, 111 S.Ct. 1632, 113 L.Ed.2d 727 (1991); *Cumber v. Beyer,* No. 93–5977, 1992 WL 184363 (D.N.J. July 15, 1992), *cert. denied sub nom, Cumber v. Morton,* 510 U.S. 954, 114 S.Ct. 406, 126 L.Ed.2d 353 (1993).

entitled to discovery as a matter of ordinary course. *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). Federal Courts may, however, "fashion appropriate modes of procedure," including discovery, to dispose of habeas petitions "as law and justice require." *Harris v. Nelson*, 394 U.S. 286, 299, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969).

Rule 6(a) of the Rules Governing § 2254 Cases provides that a party is entitled to discovery in a habeas petition if the petitioner has shown "good cause": "[a] party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."

The *Bracy* Court suggested that good cause would be found: " '[w]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief....' " *Id.* at 1799 (quoting *Harris*, 394 U.S. at 299, 89 S.Ct. 1082).

 If a petitioner can point to specific evidence that might be discovered that would support a constitutional claim, he has established good cause for further discovery. *Deputy v. Taylor*, 19 F.3d 1485, 1493 (3d Cir.1994). On the other hand, habeas petitioners "are not entitled to go on a fishing expedition through the government's files in hopes of finding some damaging evidence." *Id.*

 Before addressing whether petitioner is entitled to discovery under Rule

6(a), the Court must first identify the "essential elements" of petitioner's claims.[2] *See Bracy*, 520 U.S. at 904, 117 S.Ct. 1793 (citing *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)). Second, the Court must determine whether petitioner's allegations establish "good cause" to necessitate discovery to prove his claims, *see id.*, or whether he has failed to produce specific evidence supporting his claims and his requests constitute a "fishing expedition". *See Deputy*, 19 F.3d at 1493 (finding that petitioner failed to explain what kind of evidence he sought to discover to support his *Batson* claim); *Munoz v. Keane*, 777 F.Supp. 282, 287 (S.D.N.Y.1991) (holding that no discovery will be permitted "[b]ecause petitioners have not produced any specific evidence that supports their claim that *Brady* materials or evidence of discrimination exist[ed]").

 However, a court's blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair development of the material facts. *See East v. Scott*, 55 F.3d 996, 1001 (5th Cir.1995) (quotations and citations omitted); *see also Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir.1997) (finding discovery "essential" for petitioner to develop his ineffective assistance of counsel claim); *Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir.1996)(reversing the district court's denial of discovery where discovery was necessary for petitioner to fully develop the facts of his ineffective assistance of counsel claim).

2. A District Court in the Northern District of Illinois has held that when resolving a motion for discovery in a habeas case, these "essential elements" require the Court to look to the appropriate substantive law in the context of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *United States ex rel. Henderson v. Page*, No. 97 C 1079, 1997 WL 399623 (N.D.Ill. July 11, 1997); 28 U.S.C. § 2254(d) (requiring that a federal habeas court "must determine whether a state court decision was contrary to Supreme

Court precedent that governs the petitioner's claim" or whether it "represents an unreasonable application of Supreme Court precedent ....") (internal quotations omitted). This Court does not agree with the Northern District of Illinois that AEDPA changes the analysis of whether or not a court should grant discovery pursuant to Rule 6(a) of the habeas corpus rules, and hence will apply to this case the rules set forth in *Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997).

## IV. Application to Marshall's Petition

### A. Brady Claims

In his discovery motion, petitioner argues that discovery of specific *Brady* material previously requested is necessary for him to fully develop the facts to demonstrate in his habeas corpus petition that he is entitled to relief. Specifically, he seeks: (1) information concerning the existence, at any time prior to McKinnon's sentencing, of any pending or potential state or federal charges against McKinnon, of complaints against or investigations of McKinnon, any information about McKinnon's status as a state or federal informant, and all promises and arrangements made and expenses incurred on behalf of McKinnon and his family by the Ocean County Prosecutor's Office; (2) to depose persons with information necessary to establish his claims for relief, including law enforcement personnel, trial counsel, jurors and the trial judge; and (3) access to the State's entire file pertaining to the investigation and prosecution of Robert O. Marshall, Larry Thompson, Billy Wayne McKinnon and Robert Cumber.

### 1. Brady Material Pertaining to Billy Wayne McKinnon

Petitioner requests all information about promises and arrangements made and expenses incurred on behalf of McKinnon and his family. In both *Marshall I*, 123 N.J. 1, 586 A.2d 85, petitioner's direct appeal, and *Marshall III*, 148 N.J. 89, 690 A.2d 1, his PCR appeal, the Supreme Court of New Jersey considered the issue of whether the State's failure to disclose documents concerning the expenses the State incurred on behalf of McKinnon and his family affected the jury's verdict against petitioner. Both times the Court found that if the State had disclosed the documents and petitioner had them at trial to impeach McKinnon's credibility, there would have been no difference in the outcome of the trial.

The Court reasoned that " 'McKinnon's fundamental interest in testifying was to obtain a reduction of charges against him from capital murder to conspiracy, thereby reducing his maximum possible punishment from a death sentence to a five year prison term with no parole disqualifier.' " *Marshall III*, 148 N.J. at 161–62, 690 A.2d at 37 (quoting *Marshall I*, 123 N.J. at 206–07, 586 A.2d at 195–96). Therefore, in both appeals, the Court concluded that "[a]ny possible incremental effect on McKinnon's credibility from the additional revelation that financial accommodations were made to support his family would have been merely cumulative." *Id.*

Petitioner also requests, with regard to McKinnon, information concerning any pending or potential state or federal charges against him, complaints or investigations against him, and his status as a state or federal informant. The New Jersey Supreme Court also addressed many of these discovery requests in petitioner's PCR appeal. It held that information about whether McKinnon was in cooperation with federal authorities "would have been immaterial to the outcome of the trial." *Marshall III*, 148 N.J. at 164, 690 A.2d at 38. In reaching this decision, the Court relied on an affidavit prepared for the PCR court by Lieutenant James Churchill who supervised the murder investigation. He stated that he had no knowledge " 'that there were any charges or criminal investigations pending against McKinnon at the time of his cooperation with the FBI, or at the time of his entry into the federal witness program.' "[3] *Id.* (quoting affidavit). Based on this, the New Jersey Supreme Court found that the State did not suppress information about other crimes that could have been used to impeach McKinnon. *Id.*

---

**3.** The PCR court ordered Lieutenant James Churchill to prepare an affidavit explaining a statement he made on national television in 1989 about McKinnon's involvement in the Federal Witness Protection Program.

Presently, petitioner argues, as he did in state court, that the State withheld information that would have impeached McKinnon. He maintains that he is now entitled to all of the above-described information about McKinnon, and that he should be allowed to depose "all past and present personnel of the state police, Ocean County Prosecutor's Office, and any other state or federal agency with knowledge of this information." (Pet'r Brief, Motion for Discovery at 9–10.) Petitioner believes that only after he receives this information and deposes all those "with knowledge of this information" will he be able to fully develop the facts that prove these alleged *Brady* violations. (*Id.* at 21.)

As explained above, before addressing whether petitioner is entitled to discovery, the Court must first identify the "essential elements" of each of his claims. *Bracy,* 520 U.S. at 904, 117 S.Ct. 1793. Second, it must analyze, whether petitioner has shown "good cause" pursuant to Habeas Corpus Rule 6(a). *Id.* at 908–909, 117 S.Ct. 1793; *Deputy,* 19 F.3d at 1493.

 Under the doctrine of *Brady v. Maryland,* the Government must turn over favorable material evidence to the defense, including exculpatory evidence. 373 U.S. at 86, 83 S.Ct. 1194. Furthermore, in *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court held that the *Brady* rule includes evidence that might be used to impeach the credibility of an important witness. The "essential elements" of a *Brady* claim require a petitioner to prove that: (1) the prosecution failed to disclose evidence; (2) the evidence was of favorable character for the defense; and (3) the evidence was material. *United States v. Joseph,* 996 F.2d 36, 39 (3d Cir. 1993) (citing *Brady,* 373 U.S. at 87, 83 S.Ct. 1194). Evidence is "material" if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 681, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). At this stage, petitioner is not required to prove these elements, but, he must demonstrate that if the facts are fully developed through discovery of the requested information, he would be able to prove a *Brady/Giglio* violation and would be entitled to relief. *See* Habeas Rule 6(a); *Harris,* 394 U.S. at 299, 89 S.Ct. 1082. Here, petitioner has made no such showing with regard to the alleged *Brady/Giglio* violations by the State.

 Petitioner cannot show that the information he requests concerning McKinnon would prove the elements of a *Brady* violation. This Court agrees with the reasoning of the New Jersey Supreme Court with regard to petitioner's requested *Brady/Giglio* material. McKinnon's primary reason for testifying for the State was to avoid being charged with murder, and the terms of his immunity agreement were disclosed and known to the jury. Thus, the information about the charges against him, his informant status or the finances incurred on behalf of him and his family, would not have changed the outcome of the trial. *Bagley,* 473 U.S. at 683–84, 105 S.Ct. 3375. Because petitioner has failed to make out the essential elements of his *Brady/Giglio* claim, he cannot show good cause to support his request for documentary information about McKinnon.

## 2. Depositions of Persons with Information

 Not only does petitioner fail to show good cause in his request for documentary information about McKinnon, he has not produced any specific evidence as to why he needs to depose "all past and present personnel of the state police, Ocean County Prosecutor's Office, and any other state or federal agency." Petitioner does not explain who in this group may have information or what specific evidence he hopes to discover. This type of request does not constitute good cause but is more properly characterized as a "fishing expedition." *See Deputy,* 19 F.3d at 1493;

Rector v. Johnson, 120 F.3d 551, 562 (5th Cir.1997), *cert. denied,* 522 U.S. 1120, 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998) ("Rule 6 does not ... sanction fishing expeditions based on a petitioner's conclusory allegations."). Accordingly, his motions for discovery of information concerning Billy Wayne McKinnon's pre-sentencing, informant status, charges against him, investigations about him, and the State's expenses with regard to him, are denied.

### 3. Access to the State's Entire File

Apart from requesting *Brady* material pertaining to McKinnon, petitioner also maintains that in order to establish the full extent of the State's *Brady* violations, he should be given access to the State's entire file. The Court does not agree. A Court cannot "sanction fishing expeditions based on a petitioner's conclusory allegations." *Rector,* 120 F.3d at 562; *see also Deputy,* 19 F.3d at 1493. In *Deputy,* 19 F.3d at 1492–93, a habeas petitioner appealed the denial of both his *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), claim and his request for further discovery on the issue. The Third Circuit, affirming the denials of his claims, found that petitioner failed to explain with specificity what kind of evidence he sought to discover to support his claim. Thus, petitioner was not entitled to go on a fishing expedition through the government's files to find damaging evidence. *Id.* (citations omitted).

 In the instant case, petitioner compiled a long list of the State's alleged discovery violations and contends that based on them, this Court should exercise its discretion and require the State to make its entire file available for his inspection. Petitioner's allegations that the State has committed numerous *Brady* violations throughout the proceedings are not enough to warrant this Court to order discovery of the State's entire file.

Of all of the alleged *Brady*/*Giglio* violations, the most troublesome was the State's failure to disclose letters promising Sarann Kraushaar immunity from prosecution in exchange for her cooperation. The non-disclosure of the Kraushaar immunity letters was the subject of a limited hearing ordered by the New Jersey Supreme Court in June 1989. At that hearing and in petitioner's direct appeal, the trial court and the New Jersey Supreme Court concluded that non-disclosure of the documents was not material evidence pursuant to *Brady* because it would not have "affected the outcome of the trial." *Marshall I,* 123 N.J. at 213, 586 A.2d at 199–200 ("[i]n essence, ... [this] test requires the application of a harmless error analysis," applying the standard from *State v. Carter,* 91 N.J. 86, 449 A.2d 1280 (1982) and *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

In petitioner's direct appeal to the New Jersey Supreme Court, the Court examined whether the non-disclosure of the Kraushaar immunity documents violated *Brady.* The issue for the court was the materiality of the documents to petitioner's guilt or punishment. *Marshall I,* 123 N.J. at 200, 586 A.2d at 192. The Court held under a harmless error analysis that the non-disclosure of the documents did not affect the outcome of petitioner's trial.

 Petitioner now argues that rather than the harmless error analysis, the New Jersey Supreme Court should have applied the more stringent test set forth in *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375, that evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Petitioner has not established that, even under the *Bagley* test of materiality, he could have made out a *Brady* violation. Thus, petitioner has not explained how, under either test, the State committed a *Brady* violation. Allegations of *Brady* violations alone do not establish "good cause" to necessitate discovery. *Rector,* 120 F.3d at 563. Without a showing of good cause and without petitioner citing to specific

information of what he hopes to learn through additional discovery, this Court will not exercise its discretion and require the State to hand over its entire file.

In addition, petitioner asks permission to depose "all past and present personnel of the state police, the Ocean County Prosecutor's Office, and any other state or federal agency with knowledge of this information." (Pet'r Brief, Motion for Discovery at 21.) As discussed previously in section III of this Opinion, petitioner is required to make specific allegations that explain what kind of evidence he seeks to discover from each deponent to support his *Brady* claim. He has failed to do that here.

■■■ The case law makes clear that a district court should only exercise its discretionary power and invoke the discovery process in a habeas case when the petitioner makes a "prima facie showing of what specifically he intends to find and prove...." *Rector*, 120 F.3d at 563 ("Nor have we found any authority for the proposition that the mere assertion of a *Brady* claim necessarily amounts to good cause."). Here again, petitioner has failed to explain precisely how the State's entire file or deposing a random list of its employees is necessary to resolve his claims. Hence, his motion for discovery of the State's entire file including deposing its employees, is denied.

### B. Ineffective Assistance of Counsel

Petitioner contends that his counsel was ineffective at all stages of the trial proceedings, depriving him of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, petitioner claims that prior to his trial, his counsel provided him ineffective assistance of counsel by: failing to assure that petitioner was not deprived of his right to be tried by an impartial jury and by failing to conduct an adequate review of the evidence.

During the trial, petitioner argues that his trial counsel failed to interview, consult and present testimony about his finances, the validity of his capital needs with regard to purchasing insurance, his injuries following the murder, McKinnon's truthfulness, the authenticity of the "suicide tape," petitioner's post-murder conduct, and petitioner's character. Petitioner also asserts that during the trial his counsel failed to demand discovery, made an inappropriate commitment during his opening statement with regard to putting petitioner on the stand, allowed the prosecution to put irrelevant, prejudicial facts before the jury, failed to object to inadmissible testimony and prosecutorial misconduct, failed to elicit favorable testimony, incurred sanctions by failing to provide discovery, and failed to seek adjournment after petitioner lost consciousness between the guilt and penalty phases. During the penalty phase, petitioner maintains that his counsel failed to investigate, prepare and present a case for life, failed to request the appropriate penalty phase instructions, and never asked the jury to spare his life.

Petitioner now seeks to depose witnesses that he believes are necessary to make out his ineffective assistance of counsel claims. Petitioner seeks to depose: (1) Glenn Zeitz, his trial counsel and Russell Kolins, Zeitz's investigator; (2) James Churchill, Daniel Mahoney and Edward Murphy of the Ocean County Prosecutor's Office and Detective John Petracca of the New Jersey State Police; (3) Sarann Kraushaar, his ex-lover; (4) Dr. Sailendra Sinha, the medical examiner; (5) Charles Judick, Harrah's Casino's credit executive; (6) Janet Tekeria, Mary Pope and William Zobie, members of the First Aid Squad who treated petitioner and Dr. Anthony DiFlumeri and Dr. Walter Corrigan, his treating physicians; (7) Dorothy Mosenthine, a witness who observed petitioner on the roadway; (8) Sandra Loridans, McKinnon's sister; (9) Judith Ricci and Paul Basil, Harrah's Casino's Pit Bosses; (10) Kou–Fen Rivers and Joseph Brennan, Harrah's Casino's dealers; (11) Tony Mes-

sana, Patty Catona and Elizabeth McCloskey, Moonlight Motel employees; (12) Joseph Dougherty, petitioner's brother-in-law; (13) the twelve jurors; (14) Judge Manual H. Greenberg; (15) past and present personnel of the Ocean County Prosecutor's Office who participated in any aspect of the case; and (16) past and present personnel of the New Jersey State Police who were involved in investigating petitioner.

■ According to *Bracy*, for a court to grant a motion for discovery with regard to a petitioner's ineffective assistance of counsel claim, the Court must first identify the "essential elements" of his claim. 520 U.S. at 904, 117 S.Ct. 1793. In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court laid out the elements of a claim for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*See also Berryman v. Morton*, 100 F.3d 1089, 1094 (3d Cir.1996).

With regard to the first prong, the Supreme Court explained that the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. As to the second prong, it held that "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* at 694, 104 S.Ct. 2052. Here, the New Jersey Supreme Court found that "few of [petitioner's] allegations of ineffective assistance at trial involved significant deficiencies in the quality of counsel's representation, and those that did were not material to the trial result." *Marshall III*, 148 N.J. at 267, 690 A.2d at 90.

■ Although, at this point, petitioner does not need to prove a *Strickland* violation, he does need to explain with specificity what information he will learn from these deponents that would allow him to prove he received ineffective assistance of counsel and that he is entitled to relief. Instead, petitioner alleges that deposing each person on his long list will provide relevant information for him to make out his claims.

■ Although petitioner attempts to explain why he needs to depose some of the people on his list, he does so with generalized statements about what they might say in a deposition. In some instances, where petitioner explains his allegations in a bit more detail, he still never articulates what specific evidence each person would have or what specifically he or she would say that would show misconduct by his trial counsel. (Pet'r Brief, Motion for Discovery at 22–23.) For example, petitioner seeks to depose the members of the First Aid Squad that treated him at the scene for the injuries he received on the night of Mrs. Marshall's murder. He also seeks to depose his treating physician and the medical examiner to establish the nature and extent of his injuries on the night of his wife's murder.

In state court, petitioner argued that along with his murdered wife, he was the victim of a robbery. Therefore, he claimed that his counsel failed to elicit testimony about his injuries to show that he was a victim of a robbery. *Marshall III*, 148 N.J. at 212–13, 690 A.2d at 62–63. The New Jersey Supreme Court reviewed these allegations and dismissed them on

the merits, holding that the "evidence at trial incontrovertibly established the extent of defendant's injuries at the crime scene. The critical issue was not how badly defendant was injured, but whether the assault on [him] was staged to avert suspicion of a motive for homicide." *Id.* at 213, 690 A.2d at 63.

Petitioner contends that the members of the First Aid Squad and the treating physicians he wishes to depose, would be able to discuss the "nature and extent" of his injuries. He believes this information would prove his counsel failed to use a victim defense, that he was only a target in a robbery. However, petitioner fails to point to specific information that these deponents could provide that the jury should have had when it made its decision. Even if he deposed the doctors, nurses and First Aid Squad members who assisted him on the night of Mrs. Marshall's murder about the "nature and extent" of his injuries, there is no indication that this information would prove his counsel was ineffective. This Court agrees with the New Jersey Supreme Court's conclusion that because the jury was sufficiently apprised of petitioner's injuries, the "nature and extent" of them was not the essential issue at trial.[4] Therefore, petitioner has not met his burden of showing good cause to depose the medical personnel.

Another example is petitioner's request to depose Dr. Sailendra Sinha "regarding location and entry and exit wounds to establish position of [Maria Marshall's] body when shot." (Pet'r Brief, Motion for Discovery at 23–24.) Petitioner requests this information to prove that his counsel was ineffective for not pursuing the theory that Mrs. Marshall was not asleep at the time she was shot. Petitioner alleges that Mrs. Marshall being awake at the scene of the crime supports his assertion that he was the victim of a robbery, rather than a participant in a staged murder.

The New Jersey Supreme Court found that defense counsel's failure to retain an independent expert or his alleged ineffectiveness in preparing for the cross-examination of Dr. Sinha, a board-certified pathologist and the medical examiner who conducted the autopsy, had no material effect on "the outcome of the trial." *Marshall III,* 148 N.J. at 210, 690 A.2d at 61. Nor did the Court find that the record showed support "for the theory that the homicide had been committed to prevent the victim from identifying the perpetrators of a robbery." *Id.*

Here, petitioner fails to demonstrate how deposing Dr. Sinha would produce any evidence that his counsel was ineffective by failing to retain an independent expert to demonstrate that Mrs. Marshall was awake immediately before being murdered. Hence, petitioner has not met his burden of showing good cause to depose Dr. Sinha.

One last example is petitioner's request to depose his own trial counsel, Mr. Glen Zeitz. Petitioner seeks to depose Mr. Zeitz about all of his allegations of ineffec-

---

4. The New Jersey Supreme Court stated:
 The prosecutor's opening statement acknowledged, and the State's police witnesses verified, that at the crime scene defendant's forehead was cut and his face was bloodstained. Trooper Sink described a puddle of blood near the right rear tire of defendant's car and Detective Petracca acknowledged that when he interviewed defendant, his head was bandaged and blood was visible on his shirt and trousers.
 *Marshall III,* 148 N.J. at 206, 690 A.2d at 59. In petitioner's own testimony on cross examination, he discussed his injury on the night of Mrs. Marshall's murder:

Q An you were struck with such force that you lost consciousness; is that what you're telling this jury?
A Yes.
Q Yet there was not a mark on your face, not a scratch, not a bruise, not an abrasion.
A There was a bump on my head on this side (indicating).
Q Did you point that out to the doctor at the hospital?
A I didn't notice it until afterwards, but there was a bump there (indicating).
(28T 236–4 to 15.)

tive assistance of counsel. Petitioner asserts that through this deposition he will learn that Zeitz made poor strategic decisions, that he failed to interview witnesses, conduct an investigation and present evidence to corroborate petitioner's version of the facts during both the guilt-innocence and penalty phases of his trial.

Not only did the New Jersey Supreme Court twice conclude that Mr. Zeitz provided petitioner with effective assistance of counsel throughout both the guilt-innocence and penalty phases of trial, but, petitioner's current counsel had the opportunity to question Zeitz under oath about some of the penalty phase issues at an evidentiary hearing during the PCR proceeding. *See Marshall I*, 123 N.J. at 164–65, 586 A.2d at 171–72 ("Counsel was obviously well-prepared, thoroughly familiar with the record, and persistently and forcefully advocated his client's interests...."). Petitioner suggests that deposing Mr. Zeitz now, twelve years after the trial, would lead him to information that would show that throughout his representation of petitioner, counsel made inappropriate strategic decisions. But, petitioner fails to tell this Court what specific information Mr. Zeitz would reveal that would prove that he provided petitioner with ineffective assistance of counsel.

Even looking at petitioner's most disturbing suggestion, that Zeitz failed to sufficiently investigate and prepare for petitioner's penalty phase, petitioner has not pointed to specifics or explained precisely how deposing Mr. Zeitz would allow him to succeed in proving such a *Strickland* violation. As the New Jersey Supreme Court concluded in petitioner's PCR appeal, his request to depose Zeitz "does not allege the existence of facts, information, or specific evidence" that would allow him to prove a *Strickland* violation and entitle him to relief. *Marshall III*, 148 N.J. at 251, 690 A.2d at 82. This Court agrees with the New Jersey Supreme Court that because Mr. Zeitz consistently consulted with petitioner throughout the penalty phase and because his request does not specify what he hopes to find by deposing Mr. Zeitz, this Court is unwilling to second-guess Mr. Zeitz's strategic decisions.

In sum, petitioner never articulates with specificity what evidence each person he seeks to depose would be able to provide or what he or she would testify about that would show that his trial counsel was ineffective and that he is entitled to relief. Thus, he has not shown good cause to depose any of the requested deponents.

### C. Other Grounds

Petitioner also seeks to depose various people including the judge and jurors from his trial, to prove that: (1) he has been denied due process; (2) he had a privileged attorney-client relationship with Joseph Dougherty; (3) a spectator outburst prejudiced the jury; and (4) the judge was biased against him. As with petitioner's previous requests, his request for these depositions fails to point to specific evidence that these deponents would provide to support his contention that his trial counsel was ineffective.

### V. Motion for Evidentiary Hearing

Petitioner asserts that he is entitled to an evidentiary hearing as to his claims of *Brady* violations; the seizure, search and admission into evidence of the contents of the envelope addressed to Joseph Dougherty; ineffective assistance of counsel; a spectator outburst; and judicial bias. Petitioner alleges that "the merits of factual disputes were not resolved in the state courts because the state courts employed inadequate fact-finding procedures." (Pet'r Brief, Motion for an Evidentiary Hearing at 6.) The parties dispute whether petitioner received sufficient discovery and evidentiary hearings in his PCR proceedings.

### A. Impact of AEDPA on Evidentiary Hearings

Prior to the enactment of the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), a federal habeas petitioner's request for an evidentiary hearing was governed by Rule 8(a)[5] of the Rules Governing § 2254 cases and by the Supreme Court's decision in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *as modified by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). But, because petitioner filed his habeas petition after Congress enacted the AEDPA, his request for an evidentiary hearing is controlled by a combination of the AEDPA, 28 U.S.C. § 2254(e)(2) and the Supreme Court's decision in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). *Cardwell v. Greene*, 152 F.3d 331, 337 (4th Cir.), *cert. denied*, 525 U.S. 1037, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998).

■■■ Pursuant to the new standard of review, before petitioner may be granted an evidentiary hearing, he must satisfy the requirements of the AEDPA. Section 2254(e)(2) imposes an express limitation on the power of a federal court to grant an evidentiary hearing. *See id.* (citing *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir.1998)). The AEDPA restricts a federal court from holding an evidentiary hearing if petitioner "has *failed* to develop the factual basis of a claim in State court proceedings" (emphasis added) unless:

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).[6] Courts have interpreted "failed" to mean an omission by the habeas petitioner. *See Cardwell*, 152 F.3d at 337. Therefore, despite a petitioner's efforts, if the state court refuses to allow the factual development of his claim, he will not be automatically precluded from an evidentiary hearing under § 2254(e)(2). *See Love v. Morton*, 112 F.3d 131, 136 (3d Cir.1997) (affirming the district court's decision to hold an evidentiary hearing because the state court judge made it impossible for petitioner to develop the factual record); *see also Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998) (holding that restrictions on an evidentiary hearing do not apply when petitioner "diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so."); *McDonald*, 139 F.3d at 1059 (holding that "a petitioner cannot be

---

5. Rule 8 of the Rules Governing § 2254 cases provides:

> If the petition is not dismissed at a previous stage in the proceeding, the judge, after the answer and the transcript and record of state court proceedings are filed, shall, upon a review of those proceedings and of the expanded record, if any, determine whether an evidentiary hearing is required. If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require.

6. This provision of the AEDPA is made specifically applicable to capital cases by 28 U.S.C. § 2264(b). *See Lindh v. Murphy*, 521 U.S. 320, 338–39, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (Rehnquist, J., dissenting). Petitioner

contends that the AEDPA would have an unconstitutional retroactive effect in violation of his right to due process if § 2254(e)(2) were read to bar a hearing that would have been held under prior law. The Supreme Court considered retroactivity issues relating to the AEDPA in *Lindh* and made clear that the timing of the filing of the habeas corpus petition and not the timing of the underlying crime governs the retroactivity analysis. *Id.* at 327, 117 S.Ct. 2059; *see also Cardwell v. Greene*, 152 F.3d 331, 336 (4th Cir.1998). Marshall's petition was filed after the AEDPA was enacted in 1996. In *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3d Cir. 1999), the Third Circuit applied the AEDPA to a habeas petitioner involving a murder committed in 1998.

said to have 'failed to develop' a factual basis for his claim unless the undeveloped record is a result of his own decision or omission"); *Burris v. Parke*, 116 F.3d 256, 258–59 (7th Cir.1997) ("To be attributable to a 'failure' under federal law the deficiency in the record must reflect something the petitioner did or omitted."); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir.1997) ("Where, as here, the state courts simply fail to conduct an evidentiary hearing, the AEDPA does not preclude a federal evidentiary hearing on otherwise exhausted habeas claims.").

Thus, as the Fourth Circuit explained in *Cardwell*, the AEDPA requires a two-step analysis:

> The Petitioner who seeks an evidentiary hearing in federal court must now clear the 'initial hurdle' of § 2254(e)(2), *McDonald*, 139 F.3d at 1060, before the court can proceed to determine whether an evidentiary hearing is otherwise proper or necessary. Thus, a federal court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has 'failed to develop the factual basis of a claim in State Court.' If so, the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in § 2254(e)(2)(A) & (B). If, on the other hand, the applicant has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate or required under *Townsend*.

152 F.3d at 337.

*Townsend* defines the circumstances in which a federal evidentiary hearing is mandatory, while emphasizing that the federal courts retain discretion in many cases to grant or deny a hearing. 372 U.S. at 312–13, 83 S.Ct. 745. In *Townsend*, the

Supreme Court held that a federal court must hold an evidentiary hearing if a petitioner "alleges facts which, if proved, would entitle him to relief," and "[w]here the facts are in dispute ... if the habeas applicant did not receive a full and fair evidentiary hearing in a state court...." *Id.* The Court held that a habeas petitioner is entitled to an evidentiary hearing under the following circumstances:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.[7]

*Id.* The relevant question before this Court is whether Marshall has failed to develop the facts supporting his claim within the meaning of § 2254(e)(2). If not, then this Court must determine whether a hearing is required under *Townsend*.

### B. Application

■■■■ Petitioner asserts that the lack of factual development in his state petition was due to his inability to persuade the state courts to conduct a full evidentiary hearing, rather than to his want of trying. (*See* Pet'r Reply Brief, Motion for an Evidentiary Hearing at 6.) Petitioner alleges the following:

> 1) his repeated attempts to obtain an evidentiary hearing; 2) his compliance with state post-conviction procedures that do not authorize or require submission of documentary evidence with the

7. In *Keeney v. Tamayo–Reyes*, the Supreme Court modified the fifth condition of *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). 504 U.S. 1, 11, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). It held that an evidentiary hearing is required only if the petitioner can "show cause for his failure to develop the facts in state court proceedings and actual prejudice resulting from that failure." *Id.*

filing of a petition for post-conviction relief; 3) the state courts' wrongful refusal to order an evidentiary hearing; 4) the trial judge's wrongful dismissal of substantial claims on the basis of inapplicable procedural bars without permitting claims to be substantiated; 5) the inadequacy of the "paper hearing," caused in part by the refusal of witnesses to cooperate, which 6) produced no factual findings and virtually no application of law to the facts by the judge or the state supreme court on appeal; and 7) that the grant by a non-fact finding forum, the New Jersey Supreme Court, of Petitioner's limited application to supplement the record on the post-conviction appeal with several non-testimonial documents, did not constitute an opportunity to develop facts that Petitioner failed to take advantage of.

(Pet'r Reply Brief, Motion for an Evidentiary Hearing at 6–7.) The Court agrees that petitioner did not "fail" to develop the evidence supporting his claims in state court. He did not "relinquish an opportunity to introduce evidence or neglect[ ] to seek such an opportunity." *Cardwell,* 152 F.3d at 337. Consequently, the Court concludes that § 2254(e)(2)'s limitations do not apply to any of petitioner's claims. Hence, the Court must determine whether, under the standard for evidentiary hearings articulated in *Townsend,* petitioner is entitled to an evidentiary hearing or alternatively, whether such a hearing should be granted pursuant to an exercise of discretion. *See McDonald,* 139 F.3d at 1060 (stating that the subsequent determination [once petitioner has cleared the initial hurdle and established that § 2254(e)(2) does not preclude his claim] is committed to the district court's discretion pursuant to Rule 8 of the Rules Governing § 2254 Cases);[8]

*Porter v. Gramley,* 112 F.3d 1308, 1314 n. 6 (7th Cir.1997), *cert. denied,* 522 U.S. 1093, 118 S.Ct. 886, 139 L.Ed.2d 873 (1998)(stating that although § 2254(e) specifies circumstances under which federal courts may not grant evidentiary hearings, nothing in the statute suggests that *Townsend's* requirements are no longer in force as a separate limit on the granting of evidentiary hearings); *Lawrie v. Snyder,* 9 F.Supp.2d 428, 438 (D.Del.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1493, 143 L.Ed.2d 570 (1999)(holding that, though the 1996 amendment supersedes *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), the remainder of *Townsend* appears to have been left intact, including the other five factors under which an evidentiary hearing is mandatory and the court's overriding ability to hold a hearing in its discretion).

### C. State Post–Conviction Relief Proceedings [9]

Although petitioner never explains which *Townsend* factor he believes applies to his ten claims for an evidentiary hearing, he alleges generally that he is entitled to a hearing under the first, second, third, fifth, and sixth factors. (*See* Pet'r Brief, Motion for an Evidentiary Hearing at 14.) Petitioner contends that an evidentiary hearing is required to address: *Brady* claims pertaining to Billy Wayne McKinnon; alleged *Brady* material never provided to him; alleged suppression of the Sarann Kraushaar immunity documents; alleged discovery rules violations by the State; alleged warrantless seizure and 5–day detention of envelope addressed to Joseph Dougherty; the search warrant to open envelope addressed to Joseph Dougherty; the admission of confidential communication to Joseph Dougherty; ineffective assistance of counsel; the

---

8. The Fifth Circuit further stated: "In determining whether an evidentiary hearing is proper, the district court may expand the record and consider affidavits, exhibits, or other materials that cast light on the merits of the petition." *McDonald v. Johnson,* 139 F.3d 1056, 1060 (5th Cir.1998).

9. The summaries provided are taken from the parties' descriptions of what took place at the PCR.

spectator outburst; and the judge's bias against him.

In order to decide whether petitioner is entitled to an evidentiary hearing under the *Townsend* factors, this Court must examine what took place during the PCR stage of petitioner's state court proceedings. According to petitioner, the majority of the allegations in his application for PCR consisted of numerous allegations of ineffective assistance of trial counsel and discovery violations stemming from the State's failure to produce hundreds of documents that petitioner had been entitled to receive in pre-trial discovery. Petitioner claims he received these documents for the first time during PCR proceedings. Petitioner requested that the PCR court conduct a full evidentiary hearing to permit him to prove that the above-mentioned constitutional violations tainted his conviction and sentence. The State opposed petitioner's request for a full evidentiary hearing and moved to dismiss the petition on various grounds.

Judge Greenberg ruled that a non-testimonial ("paper") hearing would be conducted as to all alleged discovery violations, and 70 of the 267 ineffective assistance of trial counsel claims. Petitioner was able to submit a brief and any (non-live) evidence he chose. A testimonial hearing was held as to five claims, including petitioner's loss of consciousness after the guilty verdict and his counsel's comments committing petitioner to testify in his opening statement.

Petitioner sought reconsideration of the denial of a full evidentiary hearing by motions dated April 26, June 22, and November 15, 1994. Petitioner sought leave to appeal the denial of the evidentiary hearing in the New Jersey Supreme Court on June 17, 1994, which was denied. Petitioner alleges that Judge Greenberg's opinion denying PCR is "virtually devoid

of fact-finding other than as to the several allegations on which he took testimony." (Pet'r Brief, Motion for an Evidentiary Hearing at 3.) On appeal, petitioner argued that the denial of a testimonial hearing denied him due process, equal protection, and a full and fair hearing on his first PCR petition.[10]

In sum, petitioner argues that he should have been afforded a full evidentiary hearing in state court on his post-conviction petition. Petitioner alleges:

> Rather than order a remand to the trial judge for consideration of the erroneously dismissed claims and a full hearing, the state supreme court addressed the merits of all claims, despite the lack of a record, and affirmed the denial of post-conviction relief. As to claims that were dismissed by the PCR court, and claims that were not dismissed by the PCR court, the Supreme Court's opinion, like Judge Greenberg's, contains little by way of finding of fact, and much by way of conjecture and unwarranted assumption.

*Id.* at 7.

To the contrary, the State asserts that petitioner's argument distorts the state court record. The State alleges that petitioner was given ample opportunity to present factual documentation to support any claim to an evidentiary hearing to which he would have been entitled.

According to *Townsend,* 372 U.S. at 312–14, 83 S.Ct. 745, petitioner is only entitled to relief if the state court fact-finding process was deficient in some significant respect. The Supreme Court has held that federal courts have the discretion to grant evidentiary hearings when a petitioner alleges facts "which, if proved, would entitle him to relief." Alternatively, the Court held that if he proves he "did not receive a full and fair evidentiary hearing in a state court," the Court must provide him one. *Cardwell,* 152 F.3d at 336

---

**10.** An evidentiary hearing does not require "a trial type hearing at which live testimony is presented...." *Livingston v. Johnson,* 107 F.3d 297, 303 (5th Cir.1997).

(quoting *Townsend,* 372 U.S. at 312, 83 S.Ct. 745); *Lawrie,* 9 F.Supp.2d at 438.

■ Because none of the *Townsend* factors requiring an evidentiary hearing are applicable here, and all of petitioner's claims were fully and fairly developed during the state court proceedings, the Court is not required to grant petitioner's motion. The Court disagrees with petitioner that the first, second, third, fifth and sixth *Townsend* circumstances apply to him. The Court finds that because the merits of petitioner's claims were fairly resolved by the state court, he is not now entitled to an evidentiary hearing. Each state court decision is supported by detailed and well-reasoned findings applied in a constitutional framework. Petitioner has had more than an adequate opportunity to develop the record in the early stages of his review up until the PCR court proceedings. He was afforded a full and fair opportunity to be heard on his claims and the New Jersey Supreme Court addressed each of his claims extensively. *See Marshall I,* 123 N.J. 1, 586 A.2d 85; *Marshall II,* 130 N.J. 109, 613 A.2d 1059; *Marshall III,* 148 N.J. 89, 690 A.2d 1.

After reviewing the record of the state court proceedings, the petition, the answer and the expanded record, the Court concludes that an evidentiary hearing is not mandated in this case.

## VI. Habeas Corpus

Petitioner filed his petition on October 30, 1997, and it is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996.[11] The AEDPA creates the following standard which federal courts must apply when reviewing habeas petitions brought by state prisoners:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

On March 24, 1999, as a matter of first impression, the Third Circuit interpreted the standard of review provision incorporated into 28 U.S.C. § 2254(d) as amended by the AEDPA. *See Matteo v. Superintendent, SCI Albion,* 171 F.3d 877 (3d Cir. 1999). The *en banc* Court in *Matteo* held that the revised statute mandates the following two-part inquiry:

[F]irst, the federal habeas court must determine whether the state court decision was 'contrary to' Supreme Court precedent that governs the petitioner's claim. Relief is appropriate only if the petitioner shows that 'Supreme Court precedent requires an outcome contrary to that reached by the relevant state court.' *O'Brien [v. Dubois],* 145 F.3d [16,] 24–25 [1st Cir.1998]. In the absence of such a showing [if the decision was not contrary to established Supreme Court precedent], the federal habeas court must ask whether the state court decision represents an 'unreasonable application of' Supreme Court precedent: that is, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. If so, then the petition should be granted.

*Id.* at 891; *see also Williams v. Taylor,* —— U.S. ——, 120 S.Ct. 1495, 1501–02, 146 L.Ed.2d 389 (2000)(explaining how to interpret § 2254 under the AEDPA).

---

**11.** *See* footnote 5, *supra.*

The Circuit emphasized that it is not necessary to cite factually identical Supreme Court precedent. The Court asserted that the critical question is "[w]hether a Supreme Court rule—by virtue of its factual similarity (though not necessarily identical) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations—can fairly be said to require a particular result in a particular case.'" *Id.* at 888 (quoting *O'Brien v. Dubois,* 145 F.3d 16, 24–25 (1st Cir.1998)).

The Third Circuit made clear that a federal habeas court should not undertake the second step of analyzing whether the decision was based on an "unreasonable application" of Supreme Court precedent unless "the Supreme Court has articulated a rule specific enough to trigger 'contrary to' review." *Id.* It also held that the reviewing court may consider the decisions of inferior federal courts, as a "helpful amplification of Supreme Court precedent" when determining "whether the state court's application of law was reasonable." *Id.* at 890.

Petitioner alleges that he is entitled to habeas corpus relief because the State deprived him of constitutional rights. His petition is divided into four types of claims: (1) *Brady* violations; (2) due process violations; (3) "suicide tape" violations; and (4) various other constitutional violations.

## A. Brady violations

 Petitioner alleges that the State failed to disclose exculpatory and impeachment evidence in violation of *Brady,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 and *Giglio,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. In *Brady,* the Supreme Court held that if a prosecutor fails to produce exculpatory evidence, he violates the defendant's constitutional due process rights. 373 U.S. at 87, 83 S.Ct. 1194. It is well-established that exculpatory evidence as defined by *Brady* and its progeny includes impeachment evidence. *Giglio,* 405

U.S. at 153, 92 S.Ct. 763; *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375. To make out a *Brady* violation, a defendant first must demonstrate that the State had the requested evidence in its actual or constructive possession. *United States v. Veksler,* 62 F.3d 544, 550 (3d Cir.1995). Even after possession is established, not every failure to disclose information requires a reversal of defendant's conviction. *Id.* Defendant must prove that: (1) the prosecution failed to disclose evidence; (2) the evidence was of favorable character for the defense; and (3) the evidence was material. *Brady,* 373 U.S. at 86, 83 S.Ct. 1194. Evidence is "material" if there is a reasonable probability that its disclosure would have changed the result of the trial. *Bagley,* 473 U.S. at 684, 105 S.Ct. 3375.

### 1. Brady Claims with Regard to Billy Wayne McKinnon

At petitioner's trial, Billy Wayne McKinnon testified of his dealings with petitioner between June and September 1984 and explained petitioner's lead role in planning his wife's murder. *Marshall I,* 123 N.J. at 41–49, 586 A.2d at 104–08. McKinnon also admitted his own involvement in Mrs. Marshall's murder. *Id.* During the trial, the jury was aware that McKinnon was testifying under an immunity agreement with the State which cut his potential life or death sentence down to a maximum five year jail term with a promise of parole at the earliest possible date and a recommendation that he and his family enter a witness protection program. *Id.* at 195–96, 586 A.2d 85.

As discussed in the discovery section of this Opinion, the New Jersey Supreme Court found in both petitioner's direct appeal and his PCR appeal that the State's alleged failure to disclose information about (i) the promises and arrangements made and expenses incurred on behalf of Billy Wayne McKinnon and his family, (ii) any pending or potential state or federal charges against him, and (iii) his status as an informant were immaterial and would

not have changed the outcome of the trial. *Id.* at 206–07, 196–97, 586 A.2d 85; *Marshall III*, 148 N.J. at 162, 690 A.2d at 37. The Court reasoned that McKinnon's motivation in testifying was to reduce the charges against him and thus, "[a]ny possible incremental effect on McKinnon's credibility from the additional revelation that financial accommodations were made to support his family would have been merely cumulative." *Marshall III*, 148 N.J. at 162, 690 A.2d at 37 (quoting *Marshall I*, 123 N.J. at 207, 586 A.2d at 196).

The Court agrees with the New Jersey Supreme Court. The jury was aware of his agreement with the State and of his substantial involvement in the plot to kill Mrs. Marshall. For the jury to learn of alleged promises and arrangements made and expenses incurred on behalf of McKinnon and his family would not have impacted the jury's evaluation of McKinnon's credibility, nor change the outcome of their decision. Thus, petitioner does not meet the materiality prong of *Brady*/*Giglio*. Furthermore, the state court's analysis and result is neither contrary to the Supreme Court's holdings in *Brady, Giglio* and *Bagley* nor an unreasonable application of Supreme Court jurisprudence.

### 2. Brady Claims with Regard to Sarann Kraushaar

Petitioner alleges that the State committed a *Brady* violation when it failed to disclose letters between prosecutors and Sarann Kraushaar, his ex-lover, promising her immunity from prosecution in exchange for her cooperation. Specifically he asserts that if he had known of this promise, he could have used it to impeach her credibility. He alleges that the reliability of both his guilt and penalty verdicts were undermined by the nondisclosure and it allowed the jury to be "given false impressions regarding the motives, and bias affecting her testimony." (Pet'r Petition at 24.)

During the direct appeal stage of this case, petitioner learned that several documents existed relating to a promise made by Edward Turnbach, the Ocean County Prosecutor, not to prosecute Mrs. Kraushaar if she would cooperate in the investigation of this case. The New Jersey Supreme Court granted petitioner a limited remand to the trial court for a hearing about these documents. *Marshall I*, 123 N.J. at 171, 586 A.2d at 175. After a three-day hearing which included the testimony of Mr. Turnbach, Kevin Kelly, the assistant prosecutor who tried Marshall and others, the trial court concluded that the nondisclosure was not willful. (Ra5, pp. 41a–46a.) The New Jersey Supreme Court agreed that the State's nondisclosure was not willful and went on to consider the materiality of the nondisclosed evidence. *Marshall I*, 123 N.J. at 198–200, 586 A.2d at 191–92.

Refusing to apply the *Bagley* standard for materiality, the New Jersey Supreme Court instead applied the pre-*Bagley* standard set forth in *United States v. Agurs*, 427 U.S. at 104, 96 S.Ct. 2392, "whether the suppressed evidence might have affected the outcome of the trial." *Marshall I*, 123 N.J. at 199, 586 A.2d at 192. After comparing Mrs. Kraushaar's statements to the police before they promised not to prosecute her with her statements made to them afterwards and at trial, the Court concluded:

> We are satisfied that the overwhelming evidence of defendant's guilt, coupled with the consistency of Kraushaar's testimony before and after the State's non-prosecution agreement, compels the conclusion that the nondisclosure of the non-prosecution agreement was not "material" to defendant's guilt or punishment.

*Id.* at 204–05, 194, 586 A.2d 85. The New Jersey Supreme Court, in petitioner's PCR appeal, also held that these documents were immaterial in the penalty phase. *Marshall III*, 148 N.J. at 172, 690 A.2d at 42.

Still, petitioner argues here that the agreement was material because if he had access to it during trial, he could have used it to impeach Kraushaar's testimony. After reviewing the record in this case, the Court agrees with the New Jersey Supreme Court that Kraushaar's pre and post-agreement statements were consistent and not material to petitioner's guilt or punishment. In fact, Kraushaar's comments that were most damaging to petitioner were made on September 7, 1984,[12] prior to her making an agreement with prosecutors. On that date, she said that petitioner asked her if she knew anyone who could get rid of his wife so he could use her insurance proceeds to cover his debts.

Although the New Jersey courts applied the out-of-date *Agurs* test for materiality, it was less strict than the current *Bagley* standard. Applying the stricter test set forth in *Bagley*, 473 U.S. at 684, 105 S.Ct. 3375, which holds that "only if there is a reasonable probability that, had [the evidence] been disclosed to the defense, the result of the trial would have been different," this Court reaches the same conclusion as the New Jersey Supreme Court, that the agreement was immaterial. In sum, in light of the totality of the evidence presented to the jury, there is not a reasonable probability that "the result of the trial would have been different" had petitioner been in a position to use Kraushaar's immunity agreement to cross-examine her. *United States v. Pflaumer*, 774 F.2d 1224, 1230 (3d Cir.1985). Thus, the New Jersey courts' analyses and decisions are neither contrary to the Supreme Court's holdings in *Brady, Giglio* and *Bagley* nor an unreasonable application of Supreme Court jurisprudence.

### 3. *Brady Material Never Provided to Petitioner*

Petitioner alleges that the State has failed to provide him with additional *Brady* material in its possession. He alleges as an example, that the "State's file contained information concerning other suspects who were investigated," in particular Steve Thompson, his co-defendant's brother, James Otis Howard, and Sarann Kraushaar. (Pet'r Petition at 37–38.) As the New Jersey Supreme Court explained with regard to information about Steve Thompson and James Otis Howard, "[t]he essence of [these] claims is that the State allegedly suppressed information casting doubt on McKinnon's testimony ... against Marshall." *Marshall III*, 148 N.J. at 165, 690 A.2d at 39. But, the Court found that these assertions were immaterial to the jury's decisions in both the guilt-innocence and penalty phases of petitioner's trial. *Id.* at 165, 172, 690 A.2d at 39, 42.

Although the Court has addressed each of petitioner's claims of *Brady/Giglio* violations individually, as petitioner urges, *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), instructs a district court considering the impact of undisclosed evidence to do so "collectively, not item-by-item." The Court finds that the undisclosed evidence in the instant case examined collectively, is not the type to create a reasonable probability that, had it been disclosed, the outcome of petitioner's trial would have been different. *Bagley*, 473 U.S. at 684, 105 S.Ct. 3375. Thus, whether examined individually or collectively, the nondisclosed items put forth by petitioner would have been of little value in impeaching Kraushaar or McKinnon's testimony.

Based on the above, this Court finds that the New Jersey courts were correct in finding that petitioner's *Brady/Giglio* claims were without merit. Habeas relief is inappropriate because petitioner has failed to show that clearly established Supreme Court precedent requires a con-

---

**12.** Kraushaar was interviewed by Investigator Mahoney and Detective Petracca and her statement was detailed in a report prepared by Mahoney. *Marshall I,* 123 N.J. at 207, 586 A.2d at 192.

trary result to that reached by the New Jersey courts. *Matteo,* 171 F.3d at 891 (citing *O'Brien,* 145 F.3d at 24–25). The state court decisions on these alleged *Brady/Giglio* violations were also not an objectively unreasonable application of established Supreme Court jurisprudence. *Id.*

## B. Due Process Rights—Prosecutorial Misconduct

Petitioner asserts that the State was involved in a willful and persistent course of misconduct that violated his right to due process. Specifically, petitioner maintains that the prosecutor failed to disclose the Kraushaar immunity agreement, violated numerous New Jersey discovery rules, and acted and conducted himself inappropriately during trial. Respondents assert that prosecutors did not engage in misconduct in violation of petitioner's rights and that the New Jersey Supreme Court's conclusions on these issues were not unreasonable.

In *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Supreme Court articulated the standard of review for prosecutorial misconduct claims. The Court held that "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 180, 106 S.Ct. 2464 (quoting *Donnelly v. De-Christoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

### 1. Nondisclosure of Kraushaar Agreement

Petitioner alleges that the State's failure to disclose the agreement between the Ocean County Prosecutor's Office and Sarann Kraushaar was "not inadvertent" and "demonstrate[s] that the promise made to [her] was deliberately concealed from the petitioner." (Pet'r Traverse at 37.) Therefore, petitioner contends that the conclusion of the trial court, that the Kraushaar agreement was not willfully suppressed, "was based on an unreason-

able determination of the facts in light of the evidence presented in the State court proceedings." (*Id.* at 41.) (quoting 28 U.S.C. § 2254). The State argues that petitioner's arguments "construct an elaborate scheme of distortion, speculation, and hyperbole." (Resp. Answer at 46.)

In *Darden,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144, the petitioner was convicted of murder and sentenced to death. In his habeas petition, he claimed, to the Supreme Court, *inter alia,* that his conviction violated his due process rights. He argued that he was denied a fair trial because of the prosecutor's inappropriate comments during the closing statement in the guilt-innocence phase of his trial. In his closing argument, the prosecutor alleged that the death penalty, and not prison, would be the only way to ensure that petitioner never murdered again because petitioner committed the murder while on a weekend pass from prison. *Id.* at 179–80, 106 S.Ct. 2464. Although the Supreme Court condemned the prosecutor's remarks, it held that these comments did not so infect the trial with unfairness that the defendant was denied due process. *Id.* at 181, 106 S.Ct. 2464.

In the present case, petitioner asserts that the prosecutor's failure to produce the Kraushaar agreement rendered his trial unfair. After reviewing the record and the analysis of the *Darden* decision, the Court cannot say that prosecutor's [actions] "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181, 106 S.Ct. 2464. Nor can it say that the state court's application of federal law to the facts of this case were unreasonable. The New Jersey Supreme Court concluded that the State's failure to disclose the Kraushaar agreement was not willful. *Marshall I,* 123 N.J. at 171–76, 586 A.2d at 173–75. This determination was based on the Court's independent review of the testimony from the four day remand hearing on the issue. *Id.* at 192–203, 188–91, 586 A.2d 85. The Court concluded:

In our view, the testimony of Murphy, Kelly, and Sheehan presented a common theme, demonstrating diligence in the investigation of the murder and a lack of willful conduct in regard to the nondisclosure of the Kraushaar letters. We find credible their testimony to the effect that the nondisclosure was caused by the inadvertent filing of the letters in the rarely-used correspondence section of the investigation file. Therefore, we find that the State's explanation of the nondisclosure to be credible.

*Id.* at 198, 191, 586 A.2d 85. In both his PCR hearing and appeal, petitioner raised these issues, and in both instances, the New Jersey courts found that a new hearing on the matter would be futile and that nondisclosure was immaterial. *Marshall III,* 148 N.J. at 204, 690 A.2d at 58. The Court agrees and finds that the New Jersey court decisions are neither contrary to Supreme Court precedent nor an objectively unreasonable application of Supreme Court jurisprudence.

### 2. Alleged Discovery Violations

Petitioner alleges that the State's behavior throughout petitioner's prosecution with regard to discovery matters was so unfair that he was deprived of his due process rights. Specifically, he maintains that the State "ignored the rules of discovery" (Pet'r Petition at 49) and cites twelve pieces of evidence that he alleges prove that the State committed discovery violations. The New Jersey Supreme Court found that:

> The overwhelming majority of defendant's PCR discovery claims refer to documents that were either protected by the work-product privilege, largely irrelevant to the issue of defendant's guilt or innocence, or simply nonexistent. Although it appears that the State was not as meticulous as it should have been in abiding by our court rules governing discovery, there has been no showing that the State acted willfully, with malice, or with intent to conceal discoverable evidence from defense counsel.

*Marshall III,* 148 N.J. at 271–72, 690 A.2d at 92.

 After a review of the briefs and transcripts in this case, the Court finds that the acts of claimed prosecutorial misconduct based on the State's alleged discovery violations fail to rise to the level described in *Darden.* They do not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181, 106 S.Ct. 2464. Moreover, they, in accordance with the New Jersey courts' findings, are not material, exculpatory evidence under *Brady* and had they been disclosed, would not have affected the outcome of the trial. *Bagley,* 473 U.S. at 684, 105 S.Ct. 3375. In addition, a number of petitioner's claims are based on alleged violations of New Jersey's discovery rules and do not raise a constitutional issue. 28 U.S.C. § 2254(a) (holding that a district court will consider a petition for writ of habeas corpus presented by an individual "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."). Accordingly, this Court finds that with regard to the alleged discovery violations, the state courts' decisions were neither contrary to nor an objectively unreasonable application of Supreme Court precedent.

### 3. Cross–Examination of Petitioner's Sister

Petitioner alleges that the prosecutor improperly commented on his right to counsel while cross-examining his sister, Oakleigh DeCarlo, thus, violating the Sixth and Fourteenth Amendments to the United States Constitution. He contends that the prosecutor "deliberately led ... petitioner's sister, into testifying that when the investigators questioned her brother on September 21, 1984, he terminated the interrogation based on the advice of counsel." (Pet'r Traverse at 64–65.) Prior to the prosecutor's questioning of Ms. DeCarlo, the trial court had ruled that petition-

er's refusal to answer questions by police on the advice of his counsel should not come before the jury. (18T 137–13 to 24; 18T 155–10–25; 18T 160–9 to 24.)

Petitioner maintains that as the petitioner in *United States ex. rel. Macon v. Yeager*, 476 F.2d 613 (3d Cir.1973), he was severely prejudiced by the prosecutor's comments to Ms. DeCarlo on cross-examination. Respondents claim that Ms. De-Carlo's nonresponsive, voluntary testimony fails to make out a constitutional violation.

The New Jersey Supreme Court observed that Ms. DeCarlo, herself, volunteered that her brother said, "I think I should have my lawyer here if you're going to ask me any more questions." *Marshall I*, 123 N.J. at 121–24, 586 A.2d at 147–48 (quoting DeCarlo cross-examination). However, the Court found the prosecutor's follow-up to Ms. DeCarlo's statement, "Did you say to him, 'Hey Rob' Why get your lawyer. Your wife is murdered ...." to be on the verge of infringing on petitioner's rights. *Id.* It also found the prosecutor's remarks to Ms. De Carlo on re-cross-examination, "Especially when your wife has been killed and you haven't—you didn't have anything to do with it, you still run out and hire an attorney," (27T 122–12 to 14), to be offensive, improper and an infringement on petitioner's constitutional right to counsel. *Marshall I*, 123 N.J. at 124–25, 586 A.2d at 148–49. But, the Court concluded, under the *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) harmless error standard,[13] that the prosecutor's behavior was harmless beyond a reasonable doubt. *Id.* at 149, 586 A.2d 85.

■ This Court agrees with the New Jersey Supreme Court that the prosecutor's comments were improper and infringed on petitioner's constitutional right to

counsel. In *Macon*, the prosecutor, in his closing argument, told the jury that the defendant, "gets up the next morning and lo and behold, what does he do? He calls his lawyer. These are acts of innocence?" 476 F.2d at 614 (quoting closing argument). The Third Circuit found that "prosecutor's comment to the jury concerning a defendant's right to counsel [was] constitutional error." *Id.* at 615–17. However, it held under *Chapman*, that the prosecutor's error was not harmless error beyond a reasonable doubt. *Id.* The Third Circuit stated that its decision was based on the facts that "critical portions of the evidence were disputed, the credibility of the petitioner as a witness was a central issue. This is not a situation where the case against the petitioner was otherwise 'so overwhelming' that the constitutional error did not, beyond a reasonable doubt, contribute to the conviction." *Id.*

■ Contrary to *Macon*, in the instant case, the evidence against petitioner was overwhelming. The New Jersey Supreme Court found that the evidence of his guilt was so persuasive, it was "virtually impossible to conceive" that prosecutor's error contributed significantly to the jury's determination of his guilt. *Marshall I*, 123 N.J. at 125, 586 A.2d at 149. Therefore, under *Chapman*, the error was found to be harmless. *Id.* at 149, 586 A.2d 85. Additionally, the United States Supreme Court has since held that on collateral review of habeas cases, courts should follow the test set forth in *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which requires the habeas court to determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The Court finds that under this standard also, the

---

**13.** The *Chapman v. California* test requires a court to decide whether the constitutional error at issue was "harmless beyond a reasonable doubt." 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Supreme Court has stated that a constitutional error is not

harmless if "there is a reasonable probability that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

error was harmless. Consequently, this Court finds that the state court decisions were neither contrary to Supreme Court precedent nor an objectively unreasonable application of Supreme Court jurisprudence.

### 4. *Prosecutorial Comments to Witnesses in the Guilt Phase and Closing Argument*

Petitioner maintains that the prosecutor "deliberately violat[ed] Petitioner's fundamental right to due process" as a result of allegedly improper behavior. Petitioner avers that the prosecutor improperly: (1) attacked petitioner's right to present a defense and right to counsel during examination of witnesses; (2) put irrelevant, inflammatory and prejudicial matters before the jury; (3) cross-examined petitioner regarding his financial situation; (4) discussed irrelevant, inadmissable and prejudicial matters pertaining to insurance; and (5) made inappropriate comments in his both closing and penalty phase arguments. (Pet'r Petition at 90.)

██ As discussed above, a habeas court reviewing prosecutorial misconduct must determine whether the statements at issue "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 180, 106 S.Ct. 2464. To do so, the Court must look at the comments within the context of the entire trial. *United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

With regard to petitioner's allegations of prosecutorial misconduct, the New Jersey Supreme Court explained:

> Defendant alleges 116 instances of prosecutorial misconduct in the course of the trial, and contends that they require reversal of his conviction and death sentence. We have carefully reviewed each allegation. We have evaluated the conduct complained of in the context of the specific segment of the trial in which the alleged misconduct occurred and in the context of the entire proceedings, which consumed twenty-two trial days.... The trial was hard-fought and emotional, highlighted by intense and aggressive cross-examination of the principal witnesses, defendant and Billy Wayne McKinnon. All counsel employed a wide range of advocacy techniques to advance the interests of their respective clients. We have concluded that the vast majority of the asserted claims of prosecutorial misconduct are without merit, perhaps better characterized as overly-zealous advocacy than misconduct.

*Marshall I*, 123 N.J. at 152, 586 A.2d at 164. The Court went on to address only those of petitioner's assertions that it believed raised significant legal issues. Here, petitioner raises five issues, each is discussed below.

#### a. *Comments on Petitioner's Investigator*

Petitioner claims that the prosecutor's comments to him about why he hired his own investigator when seven police officers were already investigating Mrs. Marshall's murder violated his right to present a defense. Prosecutor Kelly asked petitioner:

> Q. You would have this jury believe that you hired an investigator in the person of Russ Kolins to go to Louisiana to find out what's going on down there. Is that your testimony?

> \* \* \*

> Q. Did you say, wait a minute, why am I sending an investigator to Louisiana; I'm a taxpayer. There's police officers in my town. There's seven of them investigating the crime now. Did you ever say that?

> \* \* \*

> Q. Well, would you explain to me, sir, what were you trying to do; impress the country club by solving this crime your-

self and beating the police to it? Is that what you were trying to do?

(29T 31–12 to 34–11.)

Petitioner also alleges that prosecutor Kelly's questioning of Kolins, petitioner's investigator, improperly implied that petitioner was involved in fabricating evidence; invited the jury to speculate about matters that were privileged; and demeaned the witness. (Pet'r Petition at 92–94.)

■■■ This Court finds no impropriety in counsel's comments. Counsel's remarks to petitioner and Kolins on cross-examination were made for impeachment purposes and did not infringe on petitioner's right to counsel or to present a defense. Furthermore, in light of the State's case against petitioner, it cannot be said to have had a substantial or injurious affect on the jury's decision.

### b. Inflammatory Remarks

Petitioner contends that it was irrelevant, inflammatory and prejudicial of the prosecutor: (1) to ask petitioner's sister whether she had ever said that she could not tell her brother was lying; (2) to use his cross-examination of petitioner to eulogize Mrs. Marshall; (3) to confront petitioner with statements by a friend that he spoke of Kraushaar incessantly after the murder; (4) to question petitioner about his efforts to continue a relationship with Kraushaar after his wife's murder; (5) to question petitioner about the relationships he had after his wife's murder;(6) to refer two times to Mrs. Marshall's documents in his summation after telling the court he would only discuss it for the dates on them; (7) to vouch for the credibility of McKinnon during defense counsel's cross-examination; (8) to infer that Mrs. Marshall's father was "losing his mind"; (9) to imply that Mrs. Kraushaar's father died as a result of petitioner's involvement in his wife's death; and (10) to make improper prejudicial speeches and introduce inadmissible hearsay.

■■■ The majority of petitioner's contentions were addressed by the New Jersey Supreme Court which found each issue to be either so inconsequential that it was summarily dismissed or harmless error that did not deny petitioner his right to due process. *Marshall I*, 123 N.J. at 67, 113, 128–29, 130–35, 152, 161–62, 586 A.2d at 116, 142, 151, 152–54, 164, 169–70; *Marshall III*, 148 N.J. at 204–05, 232–33, 690 A.2d at 39, 58–59, 72–73. After reviewing all of these alleged prejudicial and inflammatory acts and comments by the prosecutor, the Court agrees and finds that they did not have a substantial or injurious effect on the jury's verdict.

### c. Comments on Petitioner's Finances

■■■ Petitioner claims that prosecutor Kelly inappropriately presented a "downright deceitful, presentation of Petitioner's finances" during his cross-examination of petitioner. (Pet'r Traverse at 86.) The New Jersey Supreme Court found the prosecutor's statement that he " 'would bring in people from the banks' " if petitioner disagreed with the figures he was going to present to be "clearly improper." *Marshall I*, 123 N.J. at 154, 586 A.2d at 165. However, it found the comment to be harmless error. *Id.* This Court agrees that prosecutor Kelly's comment was an inappropriate expression of his own opinion, but that it was harmless error. The rest of the prosecutor's questions about petitioner's finances, assets and investments were warranted on cross-examination. Hence, the Court finds that these comments did not have a substantial or injurious effect on the jury's verdict.

### d. Comments on Insurance

■■■ Petitioner alleges that the prosecutor improperly elicited hearsay testimony from an insurance salesman, who implied that petitioner was a "forger." He also claimed that the prosecutor had no right to question petitioner's colleague about the appropriate amount of insurance

to take out on a non-working spouse. Because it was not necessarily improper for the prosecutor to ask petitioner's colleagues what an appropriate amount of insurance was for a non-working spouse, and the trial judge prevented the prosecutor from asking improper questions, it cannot be said to have had a substantial or injurious affect on the jury's verdict.

### e. Comments During Closing Arguments

Lastly, petitioner maintains that from the beginning of his closing argument, the prosecutor:

> [E]mbarked on an improper course through which he diminished the States burden of proof, misstated the evidence, stated as fact inferences that had not been proven or which could not be drawn, referred to matters not in evidence, indicated personal belief and superior knowledge of the facts, vouched for the credibility of State's witnesses, viciously attacked the defense, engaged in name-calling and other inflammatory argument, and improperly commented on petitioner's exercise of his rights to counsel and to defend himself.

(Pet'r Traverse at 89–90.) He also claims that the prosecutor's summation in the penalty phase was filled with impropriety. These allegations include accusations *inter alia*, that: the prosecutor improperly commented that Mrs. Marshall was asleep when she was killed ("Maria Marshall appeared to be in a sleeping position." (32T126–20 to 128–23)); the prosecutor misrepresented petitioner's receipt of insurance proceeds ("I can guarantee you . . . if you acquit this defendant, the checks will be in the mail within the week" (32T147–5 to 17)); the prosecutor inappropriately vouched for McKinnon; and the prosecutor made remarks that minimized the State's burden of proof.

Although the New Jersey Supreme Court agreed with petitioner that the prosecutor's comments about insurance proceeds were improper and that prosecutor

Kelly should not have personally vouched for the credibility of his witness, it found that the trial judge's curative instructions to the jury and the defense counsel's vigorous cross-examination were sufficient to ameliorate any prejudicial impact. *Marshall I*, 123 N.J. at 138–39, 159, 586 A.2d at 156–7, 168.

■ Petitioner's remaining accusations were either summarily dismissed by the state court or found too inconsequential to address. Further, the New Jersey Supreme Court held that the trial judge's jury instructions correctly apprised the jurors of the correct legal standard. *Id.* at 135–36, 154–55, 586 A.2d 85. After reviewing the record, this Court agrees with the state court's decision that the few improper comments made by the prosecutor during his closing argument were not enough to have had a substantial or injurious affect on the jury's decision.

### 5. Inconsistent Positions about Billy Wayne McKinnon's Credibility in the Marshall and Cumber Trials

Petitioner's last claim of prosecutorial misconduct is that the State took inconsistent positions with regard to McKinnon's credibility in petitioner's trial and in Robert Cumber's trial. He alleges that at petitioner's trial, McKinnon was described as a truth teller, while at Cumber's trial, he was described as someone not to be believed by the jury. (Pet'r Traverse at 96–97.) Petitioner contends that even though McKinnon gave consistent testimony at both trials, that Prosecutor Sheehan's comments during his closing argument in Cumber's trial implied that McKinnon's testimony was not necessarily trustworthy. Respondents assert that the State elicited essentially the same testimony from McKinnon in both trials.

McKinnon testified at Cumber's trial, as he did at Marshall's, that he never told Cumber about his plans or dealings with petitioner to kill Mrs. Marshall. (68T 63–6 to 14.) Petitioner now argues that be-

cause in his summation at Cumber's trial, Prosecutor Sheehan criticized Cumber's defense counsel for treating McKinnon with "kid gloves" on cross-examination and commented that he did not "vouch for the likes of Billy Wayne McKinnon," he took an inconsistent position from the one taken by Prosecutor Kelly at Marshall's trial, where he assured the jury of McKinnon's credibility by saying when he gave his statement "we checked it out up and down and sideways." (68T 179–17 to 18; 184–23 to 24; 32T 133–16 to 21.)

■ As respondents indicate, the New Jersey Supreme Court did not address this issue directly and instead summarily dismissed it along with most of petitioner's prosecutorial misconduct claims. In any event, this Court does not believe that petitioner's rights were violated or that Prosecutor Sheehan did anything inappropriate by questioning McKinnon's credibility or by criticizing Cumber's defense counsel's handling of McKinnon on the stand.[14] Moreover, as petitioner concedes, there is no indication that McKinnon's testimony was different in the two trials. (Compare 13T 18–4 to 70–17 with 6CT5–11 to 53–23); see Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (holding that "a state may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . .").

■ Furthermore, Cumber's trial was held three months after petitioner's trial. This Court's task on habeas review is to examine whether Marshall received a constitutional trial, not to examine the propriety of subsequent trials of different defendants. Based on the above, the Court finds that the state courts' analyses and decisions regarding prosecutorial misconduct were neither contrary to nor an unreasonable application of Supreme Court precedent.

## C. Suicide Tape Violations

### 1. The Suicide Tape

On September 27, 1984, approximately one week after police had confronted petitioner with their knowledge of his connection to McKinnon, a tape recording ("suicide tape") he made was seized from a mail receptacle at the Best Western Motel in Lakewood, New Jersey. Mr. Marshall made the recording that night while staying at the motel prior to an aborted suicide attempt. After the police were informed by a Best Western employee that petitioner had checked-in to the motel, investigators immediately established surveillance there. At approximately 11:30 p.m., the investigators watched petitioner leave his room to go to the motel's front desk. After petitioner was back in his room, the investigators spoke with the front desk clerk and learned that petitioner had dropped off two envelopes to be mailed. One envelope contained a tape recording and was addressed to Joseph Dougherty, Esq., petitioner's brother-in-law ("Dougherty envelope"). According to the New Jersey Supreme Court, the tape, made by petitioner:

> "[D]iscussed [his] relationship with Kraushaar, his intention to leave Maria [Marshall] 'within a month,' his 'spiral' of debt ... his reasons for hiring Billy Wayne McKinnon to investigate Maria. On the tape Marshall acknowledged that he had sent McKinnon $5,500 in two installments and had given him an additional $800 at Harrah's the night of the homicide."

Marshall I, 123 N.J. at 40, 586 A.2d at 103–04 (quoting the suicide tape). Petitioner moved to suppress the envelope and its contents but was unsuccessful. See id. at 62–73, 114–120, 586 A.2d 85; Marshall III, 148 N.J. at 182–200, 690 A.2d at 47–56.

---

**14.** In fact, Cumber's defense attorney objected to Prosecutor Sheehan's comments in his summation which criticized defense counsel's handling of McKinnon on cross-examination. The Court said "so long as it's a comment on something that took place during the trial in the presence of the jury and its based upon what took place ... I'll overrule the objection." (Pros. Summation, Cumber Trial 184–1 to 10.)

Petitioner now alleges that the seizure of the Dougherty envelope with the tape-recording violated the Fourth Amendment as well as federal mail statutes and regulations. He also asserts that the State's application for the search warrant misrepresented the facts and failed to establish probable cause, and hence, violated the Fourth Amendment. Lastly, he claims that the admission of the tape-recording violated his attorney-client privilege as well as the Sixth, Eighth, and Fourteenth Amendments. Respondents argue that a search and seizure may not be challenged on federal habeas review pursuant to *Stone v. Powell*, 428 U.S. 465, 494–95, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In the alternative, they claim that the envelope was properly seized, searched and admitted into evidence.

### a. Seizure of Dougherty Envelope– Federal Mail Statutes and Regulations

Petitioner argues that because he placed the envelope with the tape-recording into an authorized depository for United States mail, it was in the custody of the United States Postal Service when it was seized by State investigators. Petitioner cites to "5 U.S.C. § 301; 39 U.S.C.A. §§ 201, 404(a)(1), 3623(d); and Domestic Mail Manual Regulations 115.1, 115.21, 115.31, 115.4, 115.61, 115.7" to make this argument. (Pet'r Petition at 130–31.) He also claims that contrary to respondents' argument, *Stone v. Powell* is inapplicable to federal statutory claims raised on habeas. *Id.* at 102, 586 A.2d 85 (citing *Reed v. Farley*, 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994)). Respondents maintain that the open mail tray at the Best Western Motel was not an authorized mail receptacle and that the search and seizure was not contrary to federal law.

 The Court agrees with petitioner that his claim is not *per se* barred from habeas review by *Stone v. Powell*, because habeas review is "available to check violations of federal laws when the error qualifies as 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Reed*, 512 U.S. at 348, 114 S.Ct. 2291 (citing *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)). Although the Court does not believe petitioner has met the substantial burden of proving that his case presents a "fundamental defect" which would allow him to bring a claim of a statutory violation on habeas review, it will address petitioner's claim below.

On direct appeal, the New Jersey Supreme Court concluded that petitioner "did not manifest an actual or subjective expectation of privacy in the envelope," thus, when the investigator found the envelope which said "To be opened in the event of my death," he did not commit a Fourth Amendment violation by reading those words. *Marshall I*, 123 N.J. at 66–67, 586 A.2d at 116–17. It also found that the investigator lawfully retrieved the envelopes from the mail receptacle and did not violate petitioner's Fourth Amendment rights. *Id.* at 69–70, 117–18, 586 A.2d 85.

In addition, the Court found that federal mail statutes and regulations did not apply because at no time was the Dougherty envelope in the custody of the postal services. *Id.* at 71–72, 117–18, 586 A.2d 85. However, the Court concluded that even if it was, the "federal statute governing the classification and inspection of mail expressly permits the opening of letters of domestic origin 'under authority of a search warrant issued by law....'" *Id.* (quoting 39 U.S.C. § 3623(d)). Lastly, the Court held that based on the totality of the circumstances, there was "probable cause to believe that the envelope contained evidence that would help identify the murderer" and that the investigator/affiant who requested the warrant did not misrepresent material facts. *Id.* at 72, 119, 586 A.2d 85.

 The issue of whether the mail receptacle where petitioner left the envelope was an open tray or a closed box with a

slot has caused much controversy throughout petitioner's case. A hearing was held on the matter by the trial court. That court found and the New Jersey Supreme Court affirmed, that based on the evidence presented, petitioner's envelopes were left in an open receptacle. *Id.* at 70–71, 118, 586 A.2d 85. Additionally, respondents now cite to Domestic Mail Manual, § 151.1 which states:

> Every letter box or other receptacle intended or used for the receipt of delivery of mail ... is designated an authorized depository for mail, within the meaning of 18 U.S.C. sections 1702, 1705, 170 [1708], and 1725 except that doorslots, and nonlockable bins or troughs used in connection with apartment house mailboxes are not letter boxes within the meaning of 18 U.S.C. 1725 and are not private receptacles within the meaning of 146.2.

*See also Smith v. United States,* 343 F.2d 539, 542–43 (5th Cir.) *cert. denied,* 382 U.S. 861, 86 S.Ct. 122, 15 L.Ed.2d 99 (1965) ("The regulation plainly includes private, unlocked mailboxes, in homes and business establishments, used for delivery"); *United States v. Chapman,* 179 F.Supp. 447, 455 (E.D.N.Y.1959) (holding that it was not a crime for a hospital employee to go through mail written by patients of a hospital and collected in a mail bag to be delivered to the post office "because the mail had never been placed under federal control"). This Court agrees. Accordingly, the federal postal statutes and regulations that petitioner alleges were violated are inapplicable because petitioner's envelope was never in the "custody" of the Postal Service. Furthermore, the envelope and the tape-recording were legally seized as evidence pursuant to the Fourth Amendment. In any event, the state court analyses and decisions that the Dougherty envelope was properly seized were neither contrary to Supreme Court precedent nor an objectively unreasonable application of Supreme Court jurisprudence.

### b. Seizure of Dougherty Envelope–Full and Fair Opportunity to Litigate Fourth Amendment Claim in State Court

Petitioner maintains that due to the judge's bias and the State's misconduct in suppressing evidence favorable to him, he did not receive a full and fair opportunity to litigate his claim about the seizure of the Dougherty envelope in the state courts. Specifically, petitioner alleges that because the state court failed to apply the correct Fourth Amendment constitutional standard to the facts of his case and ignored one of his Fourth Amendment arguments, it did not fully consider his illegal seizure claim. Thus, he argues he was denied a full and fair opportunity to litigate his claim. Also, he claims that the judge's decision to exclude relevant information, favorable to the defense, showed bias. Finally, he argues that the "trial court failed to carefully and fully analyze the facts of Petitioner's Fourth Amendment claim...." (Pet'r Petition at 129–30.) Respondents contend that petitioner is barred from bringing his Fourth Amendment claim on habeas review because he had an opportunity to fully and fairly litigate it in state court under *Stone.*

The Court agrees with respondents that petitioner had a proper opportunity to litigate his claim in state court. In *Stone,* 428 U.S. at 494, 96 S.Ct. 3037, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," a district court shall not grant habeas relief "on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." In *Deputy,* 19 F.3d at 1490–91, the Third Circuit applied the rule set forth in *Stone* to the habeas petition of a state prisoner on death row. The Circuit concluded that because "Deputy had a full and fair opportunity to litigate [ ][his] Fourth Amendment issue in state court," his claim was barred on habeas review. In reaching its conclusion, the Court cited *Cardwell v.*

*Taylor,* 461 U.S. 571, 103 S.Ct. 2015, 76 L.Ed.2d 333 (1983) and *Gilmore v. Marks,* 799 F.2d 51 (3d Cir.1986), for the proposition that even potential meritorious claims and erroneously decided Fourth Amendment claims may be barred under *Stone* if the petitioner received a full and fair opportunity to litigate his claim in state court. *Id.*

Nothing in the record of this case indicates that petitioner was deprived of an opportunity to fully and fairly litigate his Fourth Amendment claim with regard to the State's seizure of the Dougherty envelope. In fact, petitioner filed a motion to suppress the envelope and its contents and the trial court conducted a pretrial hearing to determine the admissibility of the contents of the envelope. In reaching it decision, the state court considered the facts of petitioner's claim, applied the appropriate Supreme Court precedent and rejected his claim on the merits. *Marshall I,* 123 N.J. at 64–71, 586 A.2d at 115–118; *see also Marshall III,* 148 N.J. at 182–88, 690 A.2d at 47–50 (holding that the memoranda of State investigators regarding the Best Western Motel's mail receptacle was not material under *Brady* ).

■■■ Nevertheless, petitioner tries to avoid *Stone v. Powell* preclusion by arguing that the State improperly suppressed evidence favorable to him and that the judge was biased against him. However, even under the full and fair opportunity to litigate his claim test laid out in *Turentine v. Miller,* 80 F.3d 222, 224 (7th Cir.), which petitioner cites in his Traverse, he cannot bring his claim. In the instant case, during his pretrial suppression hearing, petitioner had an opportunity to argue to the state court those facts that he believed constituted a violation of his Fourth Amendment rights. *See id.* The state courts, in petitioner's pretrial hearing, at the trial level, in petitioner's PCR proceeding and on appeal to the New Jersey Su-

preme Court "carefully and thoroughly analyzed the facts and . . . applied the proper constitutional case law to the facts." *Id.* (internal quotations omitted). Therefore, as explained above, petitioner received a full and fair opportunity to litigate his claim, and pursuant to *Stone v. Powell,* habeas corpus review is precluded.[15]

### c. *Issuance of a Search Warrant–Full and Fair Opportunity to Litigate Fourth Amendment Claim in State Court*

On October 2, 1984, the State obtained a search warrant to examine the contents of the Dougherty envelope seized from the Best Western Motel five days earlier. To establish probable cause, the State submitted a thirteen page affidavit. Petitioner alleges under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), that he is entitled to suppression of the tape-recording because the State's affidavit supporting the request for a search warrant to open the envelope contained misrepresentations and omitted material information. Furthermore, he claims that because he did not get an opportunity to fully and fairly litigate his *Franks* claims, *Stone v. Powell* does not preclude this Court from reviewing his Fourth Amendment claims. He also maintains that he was denied a full and fair opportunity to litigate his search warrant claim because the trial court was biased and because the state court relied solely on state law. Respondents contend that he did have a full and fair opportunity to litigate his Fourth Amendment claims regarding the search warrant.

In *Franks,* 438 U.S. at 169–79, 98 S.Ct. 2674, the Supreme Court held that under certain circumstances, a defendant may challenge the validity of a search warrant based on the affidavit supporting a search warrant and may be entitled to an evidentiary hearing on the issue. However, the

---

**15.** The Court notes that adverse decisions by a trial judge, even if erroneous, are not evidence of bias, which can normally be inferred only from events or facts relating to matters outside the courtroom. *See* discussion at VI(D)(7).

Court stated that to warrant a hearing, "the challenger's attack must be more than conclusory. . . . There must be allegations of deliberate falsehoods or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* at 171, 98 S.Ct. 2674.

On direct appeal, the New Jersey Supreme Court found that the search warrant affidavit made by state investigators provided sufficient probable cause for an order authorizing the State to open the envelope and listen to the tape-recording. *See Marshall I,* 123 N.J. at 71–72, 586 A.2d at 119 ("The affidavit in question set forth detailed information strongly suggesting that the defendant may have been involved in the murder of his wife."). Furthermore, the Court affirmed the trial court's ruling that petitioner had not made the necessary showing of falsity in the investigators' affidavit to obtain a *Franks* hearing. *Id.* at 119, 586 A.2d 85. As explained above with regard to the seizure of the Dougherty envelope, petitioner also had a full and fair opportunity to litigate his Fourth Amendment claim on the search warrant issue in his pretrial hearing, at the trial level, in his PCR proceeding and on appeal to the New Jersey Supreme Court. Consequently, this claim regarding the search warrant for the Dougherty envelope is also barred by *Stone.*

### d. Admission of Tape–Recording—Attorney–Client Privilege

Finally, with regard to the tape-recording, petitioner alleges that it should not have been admitted into evidence because it was a privileged communication between attorney and client, thus, it violated his Sixth Amendment rights. As petitioner indicates in his Traverse, the trial court found that petitioner and Mr. Dougherty's relationship was one of friendship and not one that related to Dougherty's professional services as an attorney. (9PT 182–2 to 183–19.) Petitioner's claims that the suicide tape was irrelevant and prejudicial

were also dismissed by the trial court. The New Jersey Supreme Court affirmed this ruling and held:

> [W]e are unpersuaded that the seizure of the envelope violated the attorney-client privilege. Dougherty's role as a Pennsylvania attorney in defendant's New Jersey trial was limited in scope. Neither Dougherty nor trial counsel had informed the State that Dougherty would participate in Marshall's defense. The investigator who seized the envelope knew that Dougherty was defendant's brother-in-law, but he was unaware that he represented defendant in any capacity relating to the homicide investigation. Although [Investigator] Mohel may have been aware that the letter was addressed to an attorney, he was not obligated before seizing the envelope to determine whether the letter was protected attorney-client communication within the context of the Maria Marshall homicide investigation.

*Marshall I,* 123 N.J. at 70, 586 A.2d at 118. The Court also upheld the trial court's decision that the suicide tape could be played at trial. It found that the tape contained references to legal matters that only required Mr. Dougherty's attention if petitioner succeeded in committing suicide that night, and based on their " 'personal relationship' " and the " 'content of the communication' " that " 'defendant was attempting to memorialize his thoughts, suggestions and wishes to Dougherty primarily as a trusted friend.' " *Id.* at 73, 119–20, 586 A.2d 85 (citing trial court's findings).

On PCR, petitioner again tried to establish that the suicide tape was a confidential communication with his attorney and that it should not have been admitted. His claims were dismissed without a hearing. On appeal, the New Jersey Supreme Court rejected these claims on the merits because petitioner failed to show he had an attorney-client relationship with Mr. Dougherty. *Marshall III,* 148 N.J. at 190–95, 690 A.2d at 51–54.

Petitioner continues to argue in his habeas petition that because the suicide tape was a privileged communication between himself and his attorney, it should not have been seized or admitted into evidence. Also, he avers that the tape was not relevant and that it was so prejudicial that he was denied a fair trial.

■■■■ The attorney-client privilege "exists to foster disclosure and communication between the attorney and the client" and is to be construed narrowly. *In re Grand Jury Investigation,* 599 F.2d 1224, 1235 (3d Cir.1979). The traditional elements of the attorney-client privilege are:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication is made (a) is a member of the bar of a court or his or her subordinate, and (b) in connection with the communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client, (b) without the presence of strangers, (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Rhone–Poulenc Rorer, Inc. v. Home Indemnity Co.,* 32 F.3d 851, 862 (3d Cir. 1994). Thus, the attorney-client privilege only covers legal confidential communication "from a professional legal advisor in his capacity as such." *United States v. Moscony,* 927 F.2d 742, 751, n. 2 (3d Cir. 1991) (internal quotations omitted). Accordingly, the privilege is not invoked when one consults an attorney not as a lawyer, but as a friend or relative. *United States v. Fisher,* 692 F.Supp. 488, 492 (E.D.Pa.1988); *see, e.g., United States v. Tedder,* 801 F.2d 1437, 1440–1443 (4th Cir.1986)(holding that defendant's comments to attorney friend were not in professional capacity but as a friend); *Modern Woodmen of Am. v. Watkins,* 132 F.2d

352, 354 (5th Cir.1942) ("If the statement is ... to the lawyer merely as a personal friend, the matter is not privileged.").

■■■■ In the instant case, as described above, the New Jersey courts found that the Dougherty envelope containing the suicide tape was properly seized, the search warrant for the envelope's contents was valid and could be played at trial. The courts' analyses and conclusions that the suicide tape was not a confidential communication between petitioner and his attorney protected by the attorney-client privilege but a communication between petitioner and a "trusted friend," follow the reasoning set forth by the federal case law cited above. Therefore, this Court finds that the state court decisions were neither contrary to Supreme Court precedent nor an objectively unreasonable application of Supreme Court jurisprudence.

### D. Various Other Constitutional Violations

In the last section of his habeas petition, petitioner brings ten claims: (1) that he was denied effective assistance of counsel at all stages of the trial proceedings; (2) that the outburst of a spectator violated his rights to due process, a fair and impartial jury, and to reliable determinations as to guilt and penalty; (3) that McKinnon's testimony as to statements made by Robert Cumber were inadmissible hearsay and should not have been admitted; (4) that the trial court's instructions to the jury at both stages of the trial violated his rights to due process and reliable guilt and penalty determinations; (5) that the lack of bifurcation of the guilt-innocence and penalty phases of his trial deprived him of due process and a reliable determination of penalty; (6) that the New Jersey Capital Punishment Act and his death sentence is unconstitutional; (7) that he was denied a full and fair determination of factual and legal issues at trial and in PCR due to judicial bias; (8) that New Jersey's rule requiring a showing of good cause to contact jurors violated his rights

to investigate juror misconduct; (9) that New Jersey's procedures for reviewing capital convictions and death sentences are inadequate; and (10) that his conviction and death sentence were obtained in violation of his due process rights and the Eighth Amendment through the accumulation of constitutional error at both phases of his trial.

### 1. Ineffective Assistance of Counsel

Petitioner argues that his trial counsel rendered ineffective assistance of counsel at both the guilt-innocence and penalty phases of his trial. Specifically, he alleges fourteen instances where he believes his trial counsel's performance was deficient. Respondents submit that petitioner's list of alleged counsel deficiencies is but a "lengthy series of inconsequential minutiae" that has already been decided by New Jersey's Supreme Court. (Resp. Ans. at 172.)

The Supreme Court has long recognized that a Sixth Amendment right to counsel exists and is necessary to protect the fundamental rights of a fair trial. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The Court has also recognized, given the vital importance of counsel's assistance at trial, that "the right to counsel is the right to effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052.

In order to succeed on a claim of ineffective assistance of counsel, petitioner must first demonstrate that counsel's performance was so deficient that he was not acting as is guaranteed by the Sixth Amendment, and was not performing within reasonable professional norms. *Id.* at 687, 104 S.Ct. 2052. Petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" while considering all of the circumstances. *Id.* at 689, 104 S.Ct. 2052. Second, petitioner must show that the deficient performance of counsel prejudiced the defense in that counsel made errors so serious as to deprive him of a fair trial and a reliable result. *Id.* at 688, 104 S.Ct. 2052.

The United States Supreme Court has explained:

> [T]here is no reason for a court deciding an ineffective assistance of counsel claim ... to address both components of the [*Strickland*] inquiry if the defendant makes an insufficient showing on one.... The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which expect we will often be so, that course should be followed.

*Strickland,* at 697, 104 S.Ct. 2052. Therefore, analyzing counsel's trial strategy and choices is unnecessary. Petitioner must prove that "but, for" counsel's ineffectiveness, the result of the trial would have been different. *Id.* at 687–88, 104 S.Ct. 2052.

Because the Supreme Court has a rule specific enough to trigger "contrary to" review on this issue, *Matteo,* 171 F.3d at 888, this Court must now determine whether the state court's decision was contrary to the applicable Supreme Court precedent, and if not, whether the decision was objectively unreasonable. Applying the *Strickland* test to the facts of this case, the Court finds that petitioner was not denied his Sixth Amendment right to effective assistance of counsel. Also, the Court finds that the state court decisions on whether petitioner's trial counsel was effective were neither contrary to nor an unreasonable application of Supreme Court precedent.

## a. Jury Selection

Petitioner claims that he received ineffective assistance of counsel when his trial counsel eliminated most of the death qualification questions during jury *voir dire*. Prior to jury selection, defense counsel stated that he preferred to omit any death-qualification questions from the jury in *voir dire* because he believed it led to a conviction-prone jury. *Marshall I*, 123 N.J. at 90–92, 586 A.2d at 130. Defense counsel moved pursuant to *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir.1985) *rev'd sub. nom. Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), not to exclude prospective jurors if they opposed the death penalty·because it violated petitioner's right to an impartial jury. *Id.* The trial court denied defense counsel's motion and included questions about the death penalty in jury *voir dire*. *Id.*

After the first day of jury selection, defense counsel asked the court to limit the death-qualification of prospective jurors by limiting the questions to those three already included on the jury questionnaire, unless a juror's answer was unsatisfactory and required follow-up questioning. *Id.* at 93, 586 A.2d at 131. The court granted this motion. *Id.* On appeal, the New Jersey Supreme Court found that "defense counsel's request was a well-considered strategic attempt to limit juror exposure to questions concerning capital punishment." *Id.* In petitioner's PCR appeal, the New Jersey Supreme Court concluded that his trial counsel was not ineffective; petitioner presented nothing new on PCR review to make out a prima facie case of ineffective assistance of counsel regarding his death qualification claims. *Marshall III*, 148 N.J. at 170, 690 A.2d at 41.

 Trial counsel's strategic trial decisions are accorded great deference. *Hess v. Mazurkiewicz*, 135 F.3d 905, 908 (3d Cir.1998). The Third Circuit has stated, "that counsel has the ultimate authority to decide issues concerning 'what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed.'" *Government of Virgin Islands v. Weatherwax*, 77 F.3d 1425 (3d Cir.1996) (quoting *United States v. Teague*, 953 F.2d 1525, 1531 (11th Cir.1992)).

 Petitioner not only fails to pass the first prong of *Strickland*, that his counsel's performance was deficient, he completely fails to demonstrate that he was prejudiced by his counsel's actions in the *voir dire* process. As the New Jersey Supreme Court found, petitioner's defense counsel applied appropriate trial strategy. *Marshall I*, 123 N.J. at 164, 586 A.2d at 171; *see Carpenter v. Vaughn*, 888 F.Supp. 635, 648 (M.D.Pa.1994) (finding trial counsel was not ineffective for failing to inquire about prospective jurors' opinions of the death penalty since each juror said they could be fair and impartial with regard to applying the death penalty). The New Jersey Supreme Court's decision is supported by the record which makes clear that none of the jurors who sat on petitioner's case were predisposed to vote for the death penalty. Therefore, petitioner's claims of ineffective assistance of counsel with regard to trial counsel's death qualifying questions during jury *voir dire* are denied.

Petitioner next contends that his trial counsel was ineffective during *voir dire* because he failed to ask the jurors certain initial or follow-up questions. On appeal, the New Jersey Supreme Court found that one specific juror, Neil Marzano, who petitioner alleges gave negative answers about his ability to be fair, was fit to serve. The Court found that Marzano's "isolated negative answer" in the context of the entire *voir dire*, "[did] not demonstrate that he was unfit to serve." *Marshall I*, 123 N.J. at 87–89, 586 A.2d at 128–29. This holding was reiterated by the Court on appeal from the denial of PCR. *Marshall III*, 148 N.J. at 230–31, 690 A.2d at 71–72.

 Petitioner also claims that his trial counsel was ineffective because he should

have questioned the jury about a variety of topics including divorce, guns, insurance, casino credit, and the movie "Jagged Edge." The New Jersey Supreme Court found that defense counsel was not constitutionally required to ask the jury about any of these topics. *Marshall III*, 148 N.J. at 228–29, 690 A.2d at 70–71. In fact, it found defense counsel's questioning of witnesses during *voir dire* to be "thorough and meticulous." *Marshall I*, 123 N.J. at 94, 586 A.2d at 132.

With regard to all three of these claims, petitioner has made no showing whatsoever that his defense counsel was ineffective in any way. He has not shown that his counsel was deficient nor has he proved that he was prejudiced by counsel's actions. Accordingly, his claim for ineffective assistance of counsel with regard to his alleged impartial jury must fail.

### b. Guilt Phase

In this section, petitioner alleges that his defense counsel failed to adequately investigate and contact potential witnesses; failed to interview and prepare witnesses appropriately; and failed to consult with petitioner. Specifically, he alleges that defense counsel did not: introduce evidence of his financial health, rely on an independent expert on insurance matters, establish facts to support a victim defense, properly impeach McKinnon, demonstrate that the Best Western episode was not staged, produce testimony about petitioner's post-murder conduct, produce positive character evidence on petitioner, and develop a winning theory of defense.

Petitioner points out numerous alleged errors that defense counsel made during the guilt phase of his trial. These include defense counsel's failure to demand discovery, failure to seek curative action, failure to elicit favorable testimony, his commitment to put petitioner on the witness stand, and his incurring sanctions by failing to provide discovery. Respondents contend that defense counsel launched an aggressive assault on the State's evidence

and none of these actions were unreasonable.

As discussed above, a court must be "highly deferential" to defense counsel's trial decisions and a "strong presumption" exists that counsel acted reasonably. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. The Third Circuit has held that "only the rare claim of ineffective assistance of counsel" should succeed under this deferential standard. *United States v. Gray*, 878 F.2d 702, 711 (3d Cir.1989). Petitioner's contentions that he received ineffective assistance of counsel during the guilt phase of his trial are without merit. As the New Jersey Supreme Court held: "Defense counsel, a certified criminal trial attorney . . . provided zealous and conscientious defense of his client throughout this protracted trial. Counsel was obviously well-prepared, thoroughly familiar with the record, and persistently and forcefully advocated his client's interests throughout the guilt-phase proceedings." *Marshall I*, 123 N.J. at 164–65, 586 A.2d at 171.

 Defense counsel conducted a pretrial investigation, interviewed potential witnesses, made an independent investigation of the facts, called witnesses to support petitioner's defense, and aggressively cross-examined State witnesses. In hindsight, petitioner has compiled a long list of alleged errors and mistakes his counsel committed during his trial. The Court does not imply that defense counsel made no errors whatsoever, but that his performance was well within the required reasonable standard and his litigation strategy was based upon reasonable professional judgment. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052; *see also United States v. Kauffman*, 109 F.3d 186, 189 (3d Cir. 1997); *Hartey v. Vaughn*, No. CIV.A. 96–6812, 1997 WL 710946, at *4 (E.D.Pa. Nov. 14, 1997).

 Finally, petitioner argues that his defense counsel was ineffective because he failed to respond to a spectator's outburst of the words "Jeezuz Christ" while peti-

tioner was on the stand being cross-examined. Again, the New Jersey Supreme Court disposed of petitioner's claims of ineffectiveness stemming from this incident. *Marshall III*, 148 N.J. at 263, 690 A.2d at 88. Based on the above, petitioner has not made out a *Strickland* violation based upon his counsel's trial strategy during the guilt phase of his trial.

### c. Penalty Phase

Petitioner argues that his counsel failed to seek an adjournment or pursue "appropriate measures" after petitioner fainted following the jury's announcement of a guilty verdict and was taken to the hospital. He claims that he received ineffective assistance of counsel because his defense counsel failed to investigate, prepare and present mitigating evidence during the penalty phase of his trial. He also alleges that his counsel erred by failing to ask the jury to spare his life in his closing argument and failed to request appropriate jury instructions.

■ First, as the New Jersey courts found, defense counsel was not ineffective for failing to request an adjournment after petitioner fainted. At a hearing on the issue, two sheriff's officers, the emergency medical technician who transported him to the hospital, and his emergency room doctor testified. Based on their accounts, the PCR court found and the New Jersey Supreme Court affirmed that "defendant was physically and mentally fit to make this decision and to proceed with the penalty phase." (Ra15, Vol.29, p. 4104a.) Moreover, petitioner himself admitted at the PCR hearing that he understood what was happening, (10PCT34–13 to 35–23), and when asked by his counsel if he was ready to proceed with the penalty phase, he said, "let's get it over with." (10PCT 16–8); *Marshall III*, 148 N.J. at 245, 690 A.2d at 78. Petitioner fails to show here what an adjournment would have accomplished or how it would have affected the penalty phase. *See United States v. Lewis*, 786 F.2d 1278, 1283 (5th Cir.1986)

(holding that counsel's failure to request continuance was not ineffective where there was no indication of what evidence would have been found or what effect it would have had on the trial). Thus, defense counsel's performance in this matter was not deficient.

■ The purpose of the penalty phase of a trial is to provide the jury with information so that it can make an "individualized sentencing determination ... [based on] the character and record of the individual offender and the circumstances of the particular offense." *Penry v. Lynaugh*, 492 U.S. 302, 316, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (internal citations omitted).

The New Jersey Supreme Court rejected petitioner's contention that defense counsel failed to investigate, prepare and present mitigating evidence during the penalty phase. The Court noted that counsel relied on evidence presented in the guilt phase of trial to prove mitigating factors, that the State stipulated to a mitigating factor and the jury used two mitigating factors in its deliberations. *Marshall I*, 123 N.J. at 165–66, 586 A.2d at 172. Additionally, the Court considered the fact that several defense witnesses at trial provided testimony about petitioner's good reputation in the community and petitioner, himself, testified about "his background, education, family life, and civic activities." *Id.*

■ Moreover, petitioner and his trial counsel both testified at the PCR hearing that they had discussed the penalty phase procedure and it had been approved by petitioner. *Marshall III*, 148 N.J. at 245, 690 A.2d at 78. Specifically, trial counsel recalls that on more than one occasion, petitioner expressed his opposition to his sons testifying during the penalty phase. *Id.* at 78–79, 586 A.2d 85. The case law with regard to presenting mitigating evidence during the penalty phase in a capital case makes clear that "the key to the findings of ineffectiveness [is] not that mit-

igating evidence was not presented, but that counsel, as a result of inadequate preparation, had failed to discover the evidence." *Laws v. Armontrout*, 863 F.2d 1377, 1384–85 (8th Cir.1988) (citing *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *Darden*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144, and *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)).

Relying on *Burger*, the Third Circuit in *Deputy*, 19 F.3d at 1493–1495, affirmed petitioner's conviction and death sentence. In doing so, the Court agreed with the district court's finding that defense counsel's decision not to present testimony of Deputy's family members and counselors because it added little to what was already in evidence in the form of psychiatric reports, was a reasonable tactical decision. *Id.* In the instant case, defense counsel elected not to present additional testimony that petitioner had no prior criminal record, a good reputation in the community, and an education, or that he was a family man and was involved in civic and charitable activities because it had already been presented to the jury during the trial.

"'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support limitations on investigation.'" *Burger*, 483 U.S. at 794, 107 S.Ct. 3114 (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052). Although petitioner argues that defense counsel should have consulted a mitigation specialist, investigated further about his "psycho-social history," "family dynamic," and potential for rehabilitation, he has not suggested what information would have been learned from these sources which would have affected the jury's decision. These suggestions are far too speculative to show that a jury would have reached a different result. Accordingly, the Court does not believe that petitioner has proved that his counsel's performance was deficient. Furthermore, even if it had been, petitioner has not made a substantial showing of prejudice under *Strickland*.

Lastly, petitioner alleges that his counsel was deficient during the penalty phase because he failed to plead for petitioner's life in his penalty phase closing argument.[16] The New Jersey Supreme Court

16. Although defense counsel did not plead for petitioner's life, his closing argument during the penalty phase included:

What, in essence, we are at right now at this stage is a situation where the State has agreed that there is one mitigating factor which you must find exists in the case, and that Rob Marshall has never had any type of criminal record of any kind.

. . . .

The State has one aggravating factor which they are going to ask you to consider, and that fact is the fact, under the statute, this offense as you have found—and at this point, as a lawyer, I have to accept that you have found that—was procured by payment or the thought of payment for some pecuniary gain.

The other mitigating factor that Judge Greenberg referred to deals with other circumstances and factors which a jury may consider in mitigation with regard to the death penalty. In this particular case, in addition to the fact that Rob Marshall has no prior criminal record, there's certain things, at least with regard to his life, that

he has done, which he is entitled for you to consider.

He was involved in, among other things, with the Ocean County Businessmen's Association. You've heard that. He was campaign chairman for United Way, and for a number of years worked with them in community affairs, raising money for United Way. In addition to that, he served with his family on various social activities, involving the swim league and certain other things of community nature(4)27 . . . . Suffice to say, the record is substantial . . . and you have an absolute right to consider that as a mitigating factor.

. . . .

One thing I have to tell you about [the death penalty standard], which I think makes it an individual decision for each one of you, and that is that the only way the death penalty can be imposed is if all twelve of you agree to do it unanimously.

. . . .

All I can say is this, that I hope when you individually consider the death penalty, that you're able to reach whatever opinion you find in your heart, and that whatever you

found that although petitioner's closing argument was brief, he explained the mitigating factors and discussed the responsibility the jurors held in making a life and death decision. *Marshall I*, 123 N.J. at 166–68, 586 A.2d at 172–73. The Court also held that it was reasonable to assume that defense counsel's argument "was formulated in anticipation of the State's response" and that he strategically chose to not make too much of an emotional appeal. *Id.* In reaching its decision, the Court relied on *Romero v. Lynaugh*, 884 F.2d 871 (5th Cir.1989).

In *Romero*, the Fifth Circuit affirmed the district court's decision that defense counsel's short (less than ten sentences) penalty phase closing argument, which did not ask the jury to spare his client's life, was not deficient. *Id.* at 875–877. The Fifth Circuit reasoned that because counsel was prepared for the trial, involved in all aspects of the trial, knew the jury, knew the community and provided the jurors with mitigating evidence, his argument was sufficient. *Id.*

In this case, the New Jersey Supreme Court, applying *Romero*, held that what makes an effective closing argument in a capital case "depends on the crime, the evidence, the circumstances-in short, the entire record." *Marshall I*, 123 N.J. at 168, 586 A.2d at 173. The Court in *Romero*, 884 F.2d at 877, also stated:

> [W]e are also not prepared to fault [counsel's] effort to highlight the heavy responsibility of the jury by not burdening them with the obvious. . . . To do so comes close to insisting on a pro forma argument in every case. Had the jury returned a life sentence the strategy might well have been seen as a brilliant move. That it did not does not mean that it was outside the range of reasonable professional assistance.[17]

■■■ The Court agrees with the results and reasoning of the New Jersey Supreme Court. Although short, his closing was longer than that of the prosecutor. Based on evidence adduced at trial, defense counsel properly assumed that, because the jury was well aware of Marshall's standing in the community and his civic and charitable activities, no new evidence was required. He discussed the mitigating factors in his summation and the jury adopted them. It cannot be said that his performance during the closing argument was deficient. Moreover, even if it was, petitioner has not proved he was preju-

---

feel is the just thing to do, we can live with it.

17. In *Dobbs v. Turpin*, 142 F.3d 1383, 1387 (11th Cir.1998), the Eleventh Circuit stated that because defense counsel "never asked the jury to spare Dobbs's life or to sentence Dobbs to life imprisonment," his performance was deficient. This result is not controlling in the instant case. Prior to addressing Dobbs' closing argument claim, the Court had already affirmed the district court's decision that defense counsel was ineffective because he failed to conduct a reasonable investigation of Dobbs' background which resulted in him producing no mitigating evidence whatsoever at the sentencing hearing. *Id.* at 1387. In addition, the Court in *Dobbs* cites *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991), *cert. denied*, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992), as an example of deficient performance by counsel in a closing argument. In *Horton*, defense counsel told the jury in his closing argument that the pros-

ecutor's closing " 'made me hate my client . . . [The prosecutor] has admirably told you just exactly why it is that Jimmy Lee has got to die. And it becomes my turn to try and explain to you why you don't have to say he's got to die . . . I find my task virtually impossible . . . Maybe [the prosecutor] is right, maybe he's not. Maybe he ought to die, but I don't know.' " *Id.* at 1462 (citing defense counsel's closing argument). The Eleventh Circuit decision in *Horton*, that petitioner's trial attorney's performance during the sentencing phase was unreasonable was based on the facts that he failed to investigate and present mitigating evidence and that he attacked the client's character and separated himself from his client during his closing statements. *Id.* at 1462–63. The behavior of counsel in the instant case did not come close to the egregious level of counsel in *Horton* or *Dobbs*. Here, counsel was prepared, produced mitigating evidence, and in no way attacked his client character or separated himself from his client in the closing argument.

diced because the jury's final result was that the aggravating factor, that petitioner hired another to commit murder, outweighed the two mitigating factors, that petitioner had no history of criminal activity and that he was involved in charitable and community activities.

Petitioner's final allegation is that his counsel was ineffective because he failed to request appropriate penalty phase jury instructions. The New Jersey Supreme Court found that the trial court's instructions adequately informed the jury of its responsibility to determine whether death was appropriate in this case. *Marshall I,* 123 N.J. at 148–50, 586 A.2d at 162–63.

"Before a federal court may overturn a conviction resulting from a state trial in which [a state] instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Here, although petitioner submits to the Court a list of requests defense counsel should have made to the trial judge with regard to the jury instructions, he never demonstrates that the trial court's jury instructions as given deprived him of his rights.

In fact, many of petitioner's requests were already addressed by the New Jersey Supreme Court. For example, it rejected petitioner's claims that his defense counsel failed to present specific types of mitigating evidence which included his lack of future dangerousness and that execution would cause hardship and distress to his family. *Marshall III,* 148 N.J. at 255–56, 690 A.2d at 84–85. Moreover, courts reviewing jury instructions must view them within the process as a whole. *Cupp,* 414 U.S. at 147, 94 S.Ct. 396 ("a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge.").

Based on both the jury instruction given by the trial court and the process as a whole, the Court finds that defense counsel's performance in the penalty phase was not deficient. It is only speculation to consider whether the trial judge would have granted any or all of Marshall's jury charge suggestions. Nor can the Court find that the jury's result would have been different if some of these requests had found their way into the final jury charge.

Applying the *Strickland* test to the facts of this case, the Court finds that petitioner was not denied his Sixth Amendment right to effective assistance of counsel during the penalty phase and that the state court decisions with regard to petitioner's ineffective assistance of counsel claims were neither contrary to nor an unreasonable application of Supreme Court precedent.

### 2. Spectator Outburst

Petitioner alleges that the jury may have been prejudiced by a spectator's comment during the prosecution's cross-examination of petitioner. In making this assertion, petitioner relies on an article from the *Asbury Park Press* which reported that a spectator in the courtroom audibly uttered the words "Jeezuz Christ" during the cross-examination, which left two jurors with open mouths. (Pet'r Petition at 224.) Petitioner believes his rights to due process, a fair and impartial jury and a reliable determination as to guilt and penalty were violated by this incident.

Every defendant in a criminal case is required to receive "a fair trial by a panel of impartial, indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (internal quotations omitted). Although under certain circumstances, the Supreme Court has indicated that the trial court should conduct an inquiry and hearing to determine whether an outsider's contact with a juror was harmful to the defendant, it is not

necessary in all situations. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *see also United States v. Rigsby*, 45 F.3d 120, 122–124 (6th Cir.1995) (holding that the district court did not abuse its discretion in failing to conduct an inquiry on a suggestion of possible juror bias after someone told a juror that he could make a profit by bringing in a verdict for the defendant); *United States v. English*, 92 F.3d 909, 914 (9th Cir.1996) (holding that no evidence existed that the jury was prejudiced by a spectator comment to a juror in elevator during trial).

■ In this case, the New Jersey Supreme Court found that the spectator comment did not have any capacity to affect the trial's result. *Marshall III*, 148 N.J. at 263, 690 A.2d at 88 (Ra23, Vol. II pp. 198–203.) Petitioner has set forth no evidence that the alleged comment which he learned about in the newspaper, prejudiced the jury. In fact, the comment was not made directly to a juror or even for the benefit of any person on the jury. It is clear from the case law that the trial court's decision not to inquire about the spectator's comment, not to hold a hearing on the matter and not to give a curative instruction because of it, was appropriate and well within the bounds of his discretion. Accordingly, the Court holds that petitioner has not been deprived of his rights to due process, a fair and impartial jury or a reliable determination as to guilt and penalty by this incident.

### 3. Inadmissible Hearsay

Petitioner asserts that hearsay statements of Robert Cumber made by McKinnon while testifying at petitioner's trial denied him his right to confrontation and that the trial court's ruling that they constituted harmless error was improper. During McKinnon's direct testimony, defense counsel objected on hearsay grounds to comments McKinnon made about out-of-court statements said to him by Cumber. The prosecutor argued that the statements were admissible under the co-conspirator

hearsay exception. N.J.R.E. 803(b)(5). The trial court overruled the objection after the State said it would establish the existence of a conspiracy over the trial. At the end of the State's case, petitioner moved to dismiss the conspiracy count from the indictment. The trial court denied the motion and did not rule as to whether these alleged co-conspirator statements should be stricken from the record. *Marshall I*, 123 N.J. at 100–04, 586 A.2d at 135–38.

On appeal, after a careful review of the five alleged prejudicial statements made by Cumber, the New Jersey Supreme Court held that petitioner was not prejudiced by their admission. *Id.* It also concluded that even if the statements had been erroneously admitted, they were innocuous and that "the error was harmless beyond a reasonable doubt." *Id.* at 103, 137, 586 A.2d 85.

■ In reaching this conclusion, the New Jersey Supreme Court applied the *Chapman* harmless error test which requires the court to decide whether the constitutional error at issue was "harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. 824. After reviewing the five statements at issue, this Court agrees with the state courts' findings. Additionally, as discussed in section VI(B)(3) of this Opinion, the Supreme Court has since held that on collateral review of habeas cases, courts should follow the harmless error test set forth in *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239, which requires the habeas court to determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. The Court finds that under this standard also, even if the Cumber's statements were admitted erroneously, they were harmless to petitioner. Consequently, this Court neither finds the state court's decision was contrary to Supreme Court precedent nor an objectively unreasonable application of Supreme Court jurisprudence.

#### 4. Jury Instructions

Petitioner argues that the trial court's jury instructions in both phases of the trial denied him due process and/or violated the Eighth Amendment. Specifically, petitioner avers that the trial court improperly instructed the jury on the burden of proof, on how it should handle circumstantial evidence and in several penalty phase instructions. Respondents assert that the jury instructions were correct and that they did not violate petitioner's constitutional rights.

As discussed above, "[b]efore a federal court may overturn a conviction resulting from a state trial in which [a state] instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp*, 414 U.S. at 146, 94 S.Ct. 396.

According to petitioner, after the trial court properly instructed the jury of the State's burden to prove all elements of each offense beyond a reasonable doubt, it diluted the jury's responsibility when it gave improper instructions which implied that their duty in arriving at a verdict was to determine "the truth"[18] rather then petitioner's guilt or innocence. Citing *United States v. Pine*, 609 F.2d 106 (3d Cir. 1979), the New Jersey Supreme Court held that "[t]he concept of the State's burden to prove guilt beyond a reasonable doubt permeates the trial court's jury charge. Viewing the trial court's charge in its entirety, we are fully satisfied that defendant was not denied his constitutional right to be convicted only on proof beyond a reasonable doubt." *Marshall I*, 123 N.J. at 136, 586 A.2d at 155; *see Pine*, 609 F.2d at 107–09 (after reviewing the instruction in its entirety, no due process violation had

occurred); *Polsky v. Patton*, 890 F.2d 647, 651 (3d Cir.1989) ("Looking at the entire charge, as we are obliged to do . . . we find no merit in [petitioner's] claim that he was deprived of due process").

Petitioner also claims that the trial judge's charge on circumstantial evidence, which included the language "[i]ndeed in many cases, circumstantial evidence can be more certain, satisfying, and persuasive than direct evidence," (33T 18–5 to 13), suggested his partiality to the State. (Pet'r Traverse at 214.) Petitioner argues that this instruction implied that the court had presided over other trials where the circumstantial evidence was persuasive, and since in this case, the State relied on circumstantial evidence, it showed that the court was biased to the State. (*Id.*) The New Jersey Supreme Court rejected this contention and concluded that the statement did not prejudice petitioner in the least. It also noted that the exact language used by the trial court appears in the Model Jury Charge on Circumstantial Evidence. *Marshall III*, 148 N.J. at 242, 690 A.2d at 77.

■ After reviewing the jury instructions in their entirety, the Court agrees with the New Jersey courts' conclusions that petitioner was not deprived of due process because of the trial court's usage of the words "the truth" or its circumstantial evidence charge. *See Polsky*, 890 F.2d at 650 (applying the harmless error analysis to jury instructions, and asking "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process") (internal quotations omitted). The state courts' findings are neither contrary to Supreme Court precedent nor an objectively unreasonable application of Supreme Court jurisprudence.

---

18. The instruction in contention was:
 Ladies and gentlemen, it has been said, and correctly, that many of the words that we use are derived from the Latin, and one of the words in that category is the word ver-

 dict. The word verdict is derived from the Latin veredictum, and it means a true declaration. So let your verdict declare the truth.
 *Marshall I*, 123 N.J. at 135, 586 A.2d at 154.

Petitioner's next contention that several of the penalty phase instructions were deficient are also without merit. The New Jersey Supreme Court rejected each of petitioner's claims on its merits. First, it found that although the aggravating factor alleged by the state duplicated an element of the crime found by the jury, it did not create an error in the instructions. *Marshall I*, 123 N.J. at 138–41, 586 A.2d at 156–57. Second, the Court found that although no mitigation evidence was put forth by the defense during the penalty phase, the jury quite understood its function and its fundamental duty to decide between life and death. *Id.* In fact, as the Court explains, the trial court instructed the jury at the beginning of the sentencing phase that the sides had stipulated to the "no prior criminal history" mitigating factor and in his closing argument, defense counsel discussed petitioner's involvement in the community and charitable activities, the second mitigating factor. Furthermore, the jury's verdict sheets indicate that they considered both mitigating factors while making their decision. *Id.*

Relying on state and federal case law, and examining the jury instructions in their entirety, the New Jersey Supreme Court found that "this jury did not 'misunderstand its role in the capital sentencing proceeding or * * * the meaning and function of mitigating circumstances.'" *Marshall I*, 123 N.J. at 146, 586 A.2d at 161 (quoting *State v. Bey II*, 112 N.J. 123, 548 A.2d 887 (1988) (quoting *Peek v. Kemp*, 784 F.2d 1479, 1493–94 (11th Cir.1986))). Accordingly, this Court holds that the jury instructions in the penalty phase were constitutionally proper; they neither "so infected the entire trial that the resulting conviction violat[ed] due process," *Polsky*, at 650, nor did they have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637–38, 113 S.Ct. 1710 (applying the harmless error test). Therefore, the state court decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

### 5. Bifurcation of the Guilt–Innocence and Penalty Phases

Petitioner contends that he did not receive bifurcated guilt and penalty phases at his trial, hence, he was denied his due process rights and the Eighth Amendment was violated. He argues that his guilt and penalty phases were collapsed into each other because, "no mitigating evidence pertaining to Petitioner was proffered at the penalty phase to change the jury's focus from the facts of the offense and the aggravating factor, already proven and conceded to exist by defense counsel, to the consideration whether Petitioner was a person who should live" and "the penalty proceeding was conducted less than three hours after the jury concluded that the facts underlying the aggravating factor were proven beyond a reasonable doubt." (Pet'r Traverse at 227.) Petitioner fails to cite case law in support of his argument. In fact, his entire argument relies on Judge Handler's dissent in *Marshall I*.

▮ Bifurcated trials are not required by the Constitution. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). However, in *Gregg*, the Supreme Court upheld Georgia's capital punishment statute which contained a bifurcated proceeding, finding that the constitutional concerns that arise in carrying out capital sentencing "are best met by a system that provides for a bifurcated proceeding." *Id.* at 191–95, 96 S.Ct. 2909.

▮ The Court also explained that "[e]vidence considered during the guilt stage may be considered during the sentencing stage without being resubmitted." *Id.* at 163, 96 S.Ct. 2909 (explaining Georgia's sentencing procedures). The New Jersey Capital Punishment Act is modeled after Georgia's statute. One purpose of having bifurcated phases under the New Jersey Act "is to prevent the jury's determination of death-eligibility from being influenced by evidence relevant only to the adjudgement of the appropriate sentence."

*State v. Biegenwald,* 126 N.J. 1, 110–11, 594 A.2d 172, 232 (1991) (Stein, J., dissenting); *see also Gregg,* 428 U.S. at 191, 96 S.Ct. 2909 ("[If a unitary proceeding is used] the determination of the punishment must be based on less than all the evidence that has a bearing on that issue, such for example as a previous criminal record of the accused") (internal quotations omitted).

In the instant case, contrary to petitioner's assertions, he received a bifurcated trial. The question of petitioner's sentence was not considered by the jury until after his guilt had been determined. As this Court has discussed throughout this Opinion, petitioner received a constitutionally reasonable defense and the jury was properly instructed during both the guilt-innocence and penalty phases of his trial. Furthermore, the jury was neither influenced by outside evidence irrelevant to his case nor was it improper for defense counsel to have the jury consider evidence provided during the guilt stage at the sentencing phase. In conclusion, the Court finds that petitioner did receive a constitutionally proper bifurcated trial and hence, was not deprived of his constitutional rights.

### 6. New Jersey Capital Punishment Statute

Petitioner argues that under the New Jersey Capital Punishment Act, imposition of the death penalty on the procurer of murder for hire in the absence of additional aggravating factors violates the Eighth Amendment. He argues that the statutory structure is unconstitutional because the aggravating factor he was sentenced under duplicated an element of the crime for which he was convicted, thus, failing to narrow the class of murderers eligible for the death penalty.

This issue was addressed by the New Jersey Supreme Court which held that pursuant to the United States Supreme Court decision of *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), petitioner's sentencing was not constitutionally infirm. *Marshall*

*I,* 123 N.J. at 137–38, 586 A.2d at 155–56. In *Lowenfield,* the Supreme Court examined a death sentence imposed by the Louisiana death penalty statute, where the sole aggravating factor was duplicated by one of the statutory categories of first-degree murder. 484 U.S. at 246, 108 S.Ct. 546. The Court upheld that statute and death sentence:

> The legislature may itself narrow the definition of capital offenses ... so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide a narrowing by jury findings of aggravating circumstances at the penalty phase. * * * Here, the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty.... The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.

*Id.; see also Deputy v. Taylor,* 19 F.3d at 1500–02. The Court agrees with the state court's conclusion that petitioner's sentence and the New Jersey statute's triggering element that made petitioner eligible for the death penalty does not violate the Eighth Amendment. Consequently, the state court's decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

### 7. Judge Bias

Petitioner maintains that the Eighth Amendment was violated and he was denied due process because his trial and PCR judge, Judge Greenberg, "manifested a pattern of bias, partiality and prejudgment of issues." (Pet'r Petition at 232.) Specifically, petitioner alleges that Judge Greenberg issued erroneous rulings, gave testimony at a related civil suit during the pendency of direct appeal which allegedly

demonstrated prejudice on two issues raised on PCR, made statements in an unrelated case about OCP's discovery practices, gave a public lecture about petitioner during the pendency of the direct appeal and had an off-the-record discussion in chambers during which the judge made an inappropriate comment about petitioner.

■ "To sustain a claim of [judicial misconduct], there must be an extremely high level of interference by the trial judge which creates a pervasive climate of partiality and unfairness." *Duckett v. Godinez,* 67 F.3d 734, 740 (9th Cir.1995) (internal quotations omitted). To obtain habeas corpus relief on a challenge based on judicial misconduct, petitioner must show actual bias, that the judge treated him unfairly. *See Johnston v. Love,* 940 F.Supp. 738, 774 (E.D.Pa.1996), *aff'd,* 118 F.3d 1576 (3d Cir.), *cert. denied,* 522 U.S. 972, 118 S.Ct. 425, 139 L.Ed.2d 326 (1997). A mere allegation or the mere appearance of bias does not establish bias. *Id.; see Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Furthermore, an adverse ruling to the defense on various motions or objections is not sufficient for petitioner to make out a claim of judicial bias. *United States v. Gallagher,* 576 F.2d 1028, 1039 (3d Cir.1978).

During petitioner's PCR proceeding, he requested that Judge Greenberg be disqualified due to bias. He claimed that Judge Greenberg had shown bias by ruling adversely against the defense and by making extra-judicial remarks. The New Jersey Supreme Court examined Judge Greenberg's rulings on the contested discovery matters, his remarks while presiding over an unrelated case, his comments while testifying in a related civil trial, and his comments in a speech to a local high school about petitioner's case. After its review, the Court found that Judge Greenberg's conduct in petitioner's case did not approach the standard of disqualification and affirmed the denial of petitioner's motion. *Marshall III,* 148 N.J. at 279, 690 A.2d at 96.

■ After reviewing petitioner's allegations, the trial record and the state court decisions, the Court finds that the trial judge's comments and actions displayed no animosity towards petitioner. Petitioner has not shown that Judge Greenberg was prejudiced against him at trial, during PCR or outside the courtroom. He did not approach the "extremely high level of interference" necessary to show that the judge deprived him of due process. *Duckett,* 67 F.3d at 740. Accordingly, the state court's decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

### 8. Good Cause to Contact Jurors

Petitioner alleges that N.J.Ct.R. 1:16–1 violates the First, Sixth, Eighth and Fourteenth Amendments. Rule 1:16–1 provides: "Except by leave of court granted on good cause shown, no attorney or party shall directly, or through any investigator or other person acting for the attorney interview, examine, or question any grand or petit juror with respect to any matter relating to the case." Petitioner claims that this rule "operate[d] as a prior restraint on [his] speech and restrict[ed his] access to public proceedings in violation of the First Amendment." (Pet'r Traverse at 240.) He also argues that it violated his right to fair trial under the Sixth Amendment "because [he] wished to speak to the jurors simply to ensure that he had received a trial free of extraneous information and outside influence." (*Id.*)

The New Jersey Supreme Court affirmed the PCR court's denial of petitioner's request to interview trial jurors. In finding that petitioner's "allegations of extraneous influence lack any factual basis," the Court noted that petitioner's claim that Rule 1:16–1 was unconstitutional was not in line with "the long-standing common-law rule against inquiring into jurors' motives to impeach their verdict." *Marshall III,* 148 N.J. at 280, 690 A.2d at 96–97

(citing *Tanner v. U.S.*, 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987)). The Court reasoned that to prevent juror harassment courts typically require a showing of extrinsic influence before allowing a party to interview jurors. *Id.* (internal citations omitted).

■ As respondents contend, the state court decisions were neither contrary to nor an unreasonable application of Supreme Court precedent. Similar rules restricting lawyers' post-verdict contact with jurors have been upheld. *See United States v. Hooshmand*, 931 F.2d 725 (11th Cir.1991); *United States v. Griek*, 920 F.2d 840 (11th Cir.1991); *Haeberle v. Texas Int'l Airlines*, 739 F.2d 1019 (5th Cir. 1984); *Maldonado v. Missouri Pacific Ry. Co.*, 798 F.2d 764 (5th Cir.1986); *United States v. Kepreos*, 759 F.2d 961 (1st Cir. 1985).

In *Griek*, for example, after a criminal defendant was found guilty, he initiated a First Amendment challenge against a local rule which only allowed jury polling "after the jury has been discharged, upon application in writing and for good cause shown ... to determine whether the verdict is subject to legal challenge." 902 F.2d at 842. The Eleventh Circuit balanced Griek's First Amendment right with the Sixth Amendment right of a criminal defendant to a fair trial and examined the common law rule preventing a juror from being required to testify to impeach a verdict. The Court concluded that "[i]t is thus clear that the compelling government interest to be protected in a case such as this is the right of criminal defendants to be tried by a jury whose deliberations cannot be exposed to public view except by a showing of outside influence." *Id.* at 843; *see also Kepreos*, 759 F.2d at 967 (upholding a similar rule, "[p]ermitting the unbridled interviewing of jurors could easily lead to their harassment, to the exploitation of their thought processes and to diminished confidence in jury verdicts, as well as to unbalanced trial results depending unduly on the relative resources of the parties.") (citations omitted).

Furthermore, the New Jersey courts have specifically addressed the constitutionality of Rule 1:16–1 in *State v. Loftin*, 287 N.J.Super. 76, 105–06, 670 A.2d 557 (App.Div.), 287 N.J.Super. 76, 670 A.2d 557, 572–74 (1996). In *Loftin*, a criminal defendant challenged the constitutionality of Rule 1:16–1 during his appeal of the trial court's denial of his request to interview his jury post-verdict. The court examined the meaning of "good cause" within the Rule and upheld the Rule; the court concluded: "In allowing attorneys and litigants to question jurors for good cause, the rule provides a remedy for those extraordinary situations where an injustice might otherwise result." *Id.* at 574.

This Court is satisfied that the state court decisions to reject petitioner's request to interview jurors from his trial were appropriate. Petitioner has made no showing that would justify a contrary ruling.

### 9. Procedures for Reviewing Capital Convictions and Death Sentences

Petitioner asserts that New Jersey's procedures for reviewing capital convictions and death sentences deprive him of his rights to due process and equal protection and violate the Eighth Amendment.

Relying on *State v. Bey I*, 112 N.J. 45, 92–93, 548 A.2d 846, 871 (1988), the New Jersey Supreme Court held, "we consistently have recognized our obligation to subject capital case records to heightened scrutiny and to exercise independent review of trial court rulings and determinations, a meticulous and searching standard that we have applied to all capital cases." *Marshall III*, 148 N.J. at 265, 690 A.2d at 89. The New Jersey Supreme Court also rejected petitioner's contentions that his proportionality review was unfair and inadequate. The Court held that "[d]efendant was accorded searching and comprehensive proportionality review of his death

sentence, conducted on the basis of all information and data then available." *Id.*

In *Bey I*, the New Jersey Supreme Court examined the state death penalty law's reviewing process. The Court stated, "that in death penalty cases an appellate court must subject the record to intense scrutiny [in all phases of a capital murder prosecution] ... we have engaged in that very meticulous and searching review of the record in every capital case that has come before us." 548 A.2d at 871. The Court explained that if an error is found at any stage, reversibility is based on a "qualitative determination" that looks to the entire case to see whether the error was clearly capable of affecting the outcome of the verdict or sentence. *Id.* Citing *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), the *Bey I* Court noted that an exception to this standard is when a constitutional violation " 'casts so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless.' " *Id.* at 872. In the instant case the Court finds that the New Jersey appellate courts applied this meticulous and searching standard to petitioner's case in reaching their conclusions. Thus, his appellate review did not violate the Constitution.

As for petitioner's proportionality review, it did not violate petitioner's due process rights. The federal Constitution does not require a proportionality review in a state capital sentencing scheme. However, the Supreme Court has held that the death penalty cannot be imposed arbitrarily and capriciously. *Pulley v. Harris,* 465 U.S. 37, 49–50, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). "To avoid arbitrary and capricious imposition of the death penalty, a capital punishment law must genuinely narrow the class of persons eligible for the death penalty and reasonably justify imposition of a more severe sentence on a particular defendant...." *Deputy v. Taylor,* 19 F.3d at 1500 (citing *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *McCleskey v.*

*Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). Also, to avoid an arbitrary and capricious application of the death penalty, specific aggravating factors are required. *Id.* (citing *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)).

Petitioner alleges that he was denied due process at his proportionality review because it was administered arbitrarily. The New Jersey Capital Punishment Act, N.J.S.A. 2C:11–3 requires the narrowing of the class of death eligible defendants, the allowance of the consideration of all relevant evidence in mitigation, the finding of an aggravating factor, and a searching and comprehensive appellate review to ensure that a death sentence is not imposed in an arbitrary and capricious manner. Not only does this Court agree with the state court's finding that petitioner's review was fair, but, so long as the proportionality review was done in good faith, a federal court does not need to review the state Supreme Court's conclusions. *Banks v. Horn,* 939 F.Supp. 1165, 1175 (M.D.Pa.1996), *vacated on other grounds,* 126 F.3d 206 (3d Cir.1997) ("[W]hen state law furnishes sufficient guidance to the sentencer, there is a presumption that the sentence was not 'wantonly and freakishly imposed' ") (citing *Walton v. Arizona,* 497 U.S. 639, 655–56, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)). In this case, the proportionality review done by New Jersey's Supreme Court was done in good faith. *See Marshall II,* 130 N.J. 109, 613 A.2d 1059. Therefore, the New Jersey Supreme Court's affirmation of petitioner's sentence on proportionality did not violate petitioner's rights. *Id.*

## 10. Accumulation of Constitutional Error

In petitioner's last claim, he alleges that his conviction and death sentence were obtained in violation of his Fourteenth Amendment right to due process and the reliability required by the Eighth Amend-

ment, through the accumulation of constitutional errors at both phases of his trial. He contends that his rights were violated because the New Jersey Supreme Court found that none of the cited errors in petitioner's trial, separately or cumulatively, were reversible.

The New Jersey Supreme Court held:

Our exhaustive review of this record and defendant's claims has demonstrated that the overwhelming majority of the discovery, ineffectiveness, prosecutorial misconduct, and other claims are meritless. Few of the documents allegedly withheld in discovery were both discoverable and significant, and the production of those that were discoverable and significant would not have materially affected the result of trial. Similarly, few of the allegations of ineffective assistance at trial involved significant deficiencies in the quality of counsel's representation, and those that did were not material to the trial result. We reached a similar conclusion about the allegations of prosecutorial misconduct, and about defendant's miscellaneous claims for relief. We conclude that the cumulative effect of defendant's claims is not appreciably more significant than their individual effects. Accordingly, we reject defendant's contention that the cumulative effect of his PCR claims mandates relief.

*Marshall III*, 148 N.J. at 267, 690 A.2d at 90.

Pursuant to *Derden v. McNeel*, habeas relief may be granted under the doctrine of cumulative error when: "(1) the individual error involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" 978 F.2d 1453 (5th Cir.1992), *cert. denied*, 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993)(quoting *Cupp*, 414 U.S. at 147, 94 S.Ct. 396). Articulated differently by the Fifth Circuit, "[t]he cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." *Jackson v. Johnson*, 194 F.3d 641 at n. 59 (5th Cir.1999) (internal citation omitted).

 Because this Court believes, as the New Jersey Supreme Court found, that petitioner's trial was neither "fundamentally unfair" nor "so infected the entire trial that the resulting conviction violate[d his] due process," we decline to address his cumulative error claim. *See id.; Moore v. Gibson*, 195 F.3d 1152, 1180 (10th Cir. 1999); *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir.1997).

### VII. Conclusion

For the reasons set forth above, this Court denies petitioner's motion for discovery, his motion for an evidentiary hearing, and all counts of his habeas corpus petition pursuant to 28 U.S.C. § 2254.